JAMES H. REES *et al.*

*v.*

OTTO PELTZER *et al.*

1. LITERARY PROPERTY — *right to, at common law.* A person has a property in his literary productions consisting of maps, charts, writings and books, and in mechanical inventions, consisting of useful machines or discoveries, produced by the joint result of intellectual and manual labor, without a copyright under the act of Congress. By the common law, as long as they are kept within the possession of the author, he has the same right of exclusive enjoyment of them as of any other species of personal property, for when so kept, they have proprietary marks, and are distinguishable property.

2. Same — *lost by publication.* But when these literary or mechanical products are circulated abroad, and published with the author's consent, they become common property, and subject to the free use of the community ; or, in other words, there is no copyright in a *published* work at common law, and such copyright exists only by statute.

3. Thus, where a person compiled maps of the city of Chicago, of a particular design, from the public records into an atlas, and, without taking out any copyright under the act of Congress, made several copies of the original in a form suitable for comprising atlases, sold several, and placed one copy in the hands of the city for public use, where any part or the whole of it could be copied and used by any citizen, placing no restrictions on their use : *Held,* that the author thereby made a voluntary publication of the same, dedicated them to the public use, and consequently lost his proprietorship in them, which he had at common law before publication, and they became public property, subject to the free use of the community.

4. Same — *sale of right to city.* In such a case, where all the copies were destroyed by fire, except two owned by two firms of real estate brokers, and they formed a partnership to secure a monopoly in the sale of information to be derived from such maps, and additions made thereto by the owners before the destruction of the public records by fire, and these firms sold to the city a copy for the sum of $5,000, though a member of one of the firms, who was also a member of the common council, and one of the finance committee, he urging that they ought to receive so large a price, as the firms would thereby lose their monopoly, it was *held,* on bill filed by one of the firms, to restrain the publication of lithographed copies for sale, on the ground that it infringed their private rights, that the bill would not lie, and that the member of the firm who made the contract with the city was estopped from alleging that the privilege so purchased by the city was only for a limited, and not a general public use, and the members of the other firm were equally estopped by his acts, as they were jointly interested with him in the sale.

5. The sale to the city of the privilege of making a copy of city maps, even conceding them to be private property, for public use, without restriction by the contract as to the use of the copy, will make such right common property thereafter, and any person, by permission of the city authorities, may make copies of the whole, or any part of the maps belonging to the city, and publish the same, and equity will not interfere to prevent the same.

6. Parties in chancery. When two real estate firms, having the only two copies of maps of the city of Chicago after the great fire of October, 1871, there being nothing left of the same character, formed a co-partnership, based upon their two sets of maps, and their uses in furnishing information, rendered valuable by the total destruction of the public records,

and A, of one of the original firms, acting for the benefit of the new firm, sold a copy of such maps for the use of the city: *Held,* on bill by the members of the other original firm to restrain the publication of such copy, that the members of both firms, being equally interested, were necessary parties.

APPEAL from the Circuit Court of Cook county; the Hon. WILLIAM W. FARWELL, Judge, presiding.

This was a bill in chancery, filed by James H. Rees, Luther H. Pierce, Elisha E. Hundley, partners composing the firm of Rees, Pierce & Co., against Otto Peltzer, Edward A. Fox, G. R. Hoffman, composing the firm of Peltzer, Fox & Hoffman, and Bernard Essroger, Edward Reuhlow, Francis Doniat, Bernard H. W. Zastrowkussow, Henry Betz and Ferdinand Knopwurst, composing the firm of Essroger, Reuhlow & Co., and W. H. Carter, R. Prindeville, and J. K. Thompson, commissioners of the Board of Public Works of Chicago. The object of the bill and facts of the case will appear in the opinion.

Messrs. HARDING, McCOY & PRATT, for the appellants.

Mr. J. V. LE MOYNE, and Mr. M. W. ROBINSON, for the appellees.

Mr. JUSTICE McALLISTER delivered the opinion of the Court:

This is an appeal from the decree of the Circuit Court of Cook county, dismissing appellants' bill, exhibited on the chancery side of that court, against appellees, for the purpose of restraining the publication of a certain atlas, comprising maps originally compiled from public records and other sources, representing in compact, convenient form, the sub-divisions, streets, alleys, etc., of Chicago, on the ground of an invasion of a copyright therein, attaching to appellants' ownership of such an atlas, from which, by their consent, and for a valuable consideration, the Board of Public Works were authorized to make a copy for the use of the city, from which latter copy, that, the publication of which was sought to be restrained, was made.

Although appellants' counsel have referred to acts of Congress relating to copyrights, yet it must be apparent to them on reflection, that the right upon which their title to relief is based, springs wholly from the common law.

Among the instances of property acquired by one's own act and power of original acquisition, given by elementary writers and courts, is that of literary property, consisting of maps, charts, writings and books ; and of mechanical inventions, consisting of useful machines or discoveries, produced by the joint result of intellectual and manual labor. By the common law, as long as these are kept within the possession of the author, he has the same right of exclusive enjoyment of them as of any other species of personal property ; for, when so kept, they have proprietary marks, and are distinguishable property. 2 Kent's Com. 366.

This doctrine is familiar, and, as to which, there is no conflict of authority. The effect of circulation and publication, with the author's consent, upon that proprietary interest, has given rise to much discussion and various judicial views. See *Miller* v. *Taylor*, 4 Burr. 2303 ; *Donaldson* v. *Beckett*, ib. 2408 ; 2 Bro. P. C. 129 ; *Cadwell* v. *Robertson*, 5 Pat. Sc. Ap. 493. It may, however, be now considered as established, that when these products are circulated abroad, and published with the author's consent, they become common property, and subject to the free use of the community ; or, in other words, that there is no copyright in a *published* work at common law, and such copyright exists only by statute. 2 Kent, *supra ; Jeffreys* v. *Boosey*, 4 H. L. 833 ; *Reade* v. *Conquest*, 9 C. B. (N. S.) 768 ; *Wheaton* v. *Peters*, 8 Pet. (U. S.) 591 ; *Little* v. *Hall*, 18 How. (U. S.) 170 ; Kerr on Injunc. 446.

Now, keeping in view the common law principles evolved by the authorities as above stated, let us give a brief summary of the facts, and apply those principles to them. In 1859 or 1860, there was in Chicago an Englishman of the name of W. P. Davie, possessed, as we would infer, of great skill, and who was en-

gaged in the business of making maps. Articles of the sort in question became a matter of necessity, not only to the Board of Public Works, but to surveyors, and those who made dealing in real estate a sort of profession. At all events, the attention of members of the Board of Public Works, and of Mr. S. H. Kerfoot, a real estate dealer in Chicago, became attracted to Davie, with the view of having him prepare such maps. So far as this record shows, the plan, that is, the principal ideas embodied in it, originated with Kerfoot. However that may be, maps on that plan were compiled from the public records of the city and county, into an atlas. It is not clear from the evidence, whether there was more than one original, though it is not at all probable that there was; nor is it clear whether Kerfoot or the Board of Public Works obtained such original; nor is it material, for we think it is clearly shown that Davie, without taking out any copyright under the acts of Congress, made several copies of his original maps, in a form suitable for comprising atlases, and sold them to various real estate dealers, among which, was a set to the real estate firms, respectively, of Rees & Slocum and Ogden & Sheldon; these latter being exact copies of the set made for the Board of Public Works. Rees & Slocum's being the last copy made by Davie, was sold to them about the year 1863; and Davie soon thereafter left Chicago, with the declaration that he was going back to England, and has never been heard from since. It is clear beyond controversy, that by failing to take out a copyright under the laws of the United States, by placing one of these atlases, either the original or a copy, in the hands of the city for public use, where any part, or the whole of it, could be copied and used by any citizen who desired, by selling several copies to real estate dealers without any restriction as to their use, Davie, the author, if he may be regarded as such, made a voluntary publication of his productions, dedicated them to public use, and thereby lost his proprietorship in them, which he had at common law before publication, and they became common property, subject to the free use of the community.

Would it be claimed that, if at any time prior to the great fire of 1871, Peltzer had made copies of the set which belonged to the city, with the view of lithographing and preparing them for general sale, either Davie or Rees & Co. could apply to a court of equity and have the publication restrained, on the ground of its being an invasion of their copyright therein? It is expressly conceded by counsel that they could not.

Sometime after the purchase of the copy from Davie by Rees & Slocum, Pierce and Hundley formed a co-partnership with Rees, and they together succeeded to the title of Rees & Slocum. This copy, it is true, was a part of their private property; but the proprietary interest of Davie in the product of his intellectual and manual labor in making the original, from which this and other copies had been made, circulated and published, had become a part of the common property of the community. There remained nothing of a copyright at common law attaching to appellants' copy. The copyright of Davie in his original draught was not assigned to Rees & Slocum, but was lost by the sale and publication. For, each owner of a copy could confer a right upon a third person to make a copy from his, and put it to any use desired, and no other owner of a copy could interfere, by injunction or otherwise, on the ground of an invasion of a copyright. Nor can we perceive how the character of appellants' interest in this atlas could be changed by the subsequent addition of details, in accordance with new additions and sub-divisions, changes in old ones, or in the matter of streets, alleys, or the location of railroads. There was no change of the plan ; the ideal of Kerfoot or Davie was still preserved and followed. The introduction of these details under the same plan conceived by its author, was little else than mere manual labor, because it was principally copied from the continuations of the atlas belonging to the city, and by appellee Peltzer, who was superintendent of maps for the city. But even if it were otherwise, it would make no difference, in the view we take of another feature of the case.

When the great fire in Chicago came, October 8, 1871, all these maps or atlases made by Davie, and published as we have stated, together with the records of the city and county, from which they were compiled, were destroyed, with the sole exception of the set belonging to appellants, and that of Ogden & Sheldon. There seems to have been nothing left of the same character.

These real estate firms being the sole possessors of the remaining two sets, the original sources of which were almost wholly destroyed, they, at once, conceived the idea of a monopoly in the sale of information of daily and pressing necessity. To that end, they formed a co-partnership, based upon these two sets of maps, and their uses. This is expressly alleged in appellants' bill and shown by the proofs. The board of public works, being deprived of the set formerly belonging to the city, and having daily necessity for their use, caused negotiations to be entered into with this new firm for the privilege of obtaining a copy of their maps, or, in other words, supplying what had been lost by the fire, and which could not be supplied from public records. In these negotiations, not only members of the old firm of Rees & Co., appellants, but of Ogden & Sheldon, participated, because both were jointly interested.

The consideration required by them of the city was $5,000. It was graduated by the dictates of a conscious monopoly, and was apparently exorbitant. The members of the board had no legal authority to make a contract of that nature binding on the city. They could only ascertain the need of the privilege, the terms on which it could be obtained, and report the matter to the common council for its action.

This, they undertook to do, and it is all. The matter having advanced this far, the appellants and Ogden & Sheldon permitted the copying to be commenced; and it had been partly done under this inchoate contract, when the board sent in their report in respect to it, which is as follows:

61—75TH ILL.

OFFICE OF THE BOARD OF PUBLIC WORKS,
CHICAGO, *Dec.* 11, 1871.

*To the Mayor and Aldermen of the city of Chicago in Com-
mon Council assembled:*

The Board of Public Works respectfully represent that all
the maps and plats belonging to the city were destroyed at the
time of the fire.    The only complete copies of the atlas of the
city now in existence, so far as the board are able to ascertain,
are those belonging to J. H. Rees & Co. and to Ogden, Shel-
don & Co.    These are tracings upon cloth from original maps,
and are believed to be quite correct.    The result of a negotia-
tion which the board have been ·trying to make for copies of
these maps is a proposition from the owners to allow the city to
make copies by paying as compensation therefor the sum of
$5,000.

A constant reference to these maps is necessary in course of
business connected with the city, and it is of the utmost import-
ance that the city be in possession of them.

The board are inclined to think that the price asked is as
reasonable as could be expected under the circumstances, and
therefore recommends the passage of the following order, author-
izing the board to arrange with Messrs. J. H. Rees & Co., and
Ogden, Sheldon & Co., for making copies of their maps at the
price named.

Respectfully submitted,

J. McARTHUR,    ⎫ *Board of Public Works.*
R. PRINDEVILLE,    ⎭

This was the only mode, under the charter, in which a contract
binding upon the city could be made; and of this appellants
and their co-partners, Ogden & Sheldon, were bound to take
notice.    Especially is this so, in view of the fact that Mr. Ogden
was not only a member of the council, but of the finance com-
mittee, through whose recommendation the matter was to be
brought before the council for action.    Upon the foregoing
report the finance committee first acted, Mr. Ogden, as a mem-

ber, insisting that this large sum should be paid, on the ground that the owners of the maps would thereby lose their monopoly. He asked for no restrictions; none are contained in the report of the Board of Public Works. The finance committee were induced by the urgency of Mr. Ogden, one of the proprietors of the maps, and jointly interested with appellants in the very contract proposed by the board to be consummated by the common council, to accede to the terms so proposed. The finance committee reported in favor of the city accepting them, and the council passed an ordinance to that effect. The contract, in fact, and legal effect, made, was with the city of Chicago, and not with the Board of Public Works, as is alleged in the bill of complaint, and it was with Ogden & Sheldon as much as with appellants. The latter are as much bound by the action of Ogden as if all had been personally present.

It was the privilege or license to make copies for public use, to be paid for out of the public treasury, which was sold. The argument of Ogden in favor of the exorbitant price exacted, was that because the copy so made was for public use, it would deprive them in a measure of the benefit of the monopoly which the circumstances gave them. Is not Ogden, who was thus acting in an official and fiduciary capacity for the taxpayers of Chicago, but in making a contract in his own favor, estopped from alleging that this privilege, so purchased, was only for a limited, and not a general, public use? If he is estopped, so are appellants, who were jointly interested with him.

We might go further, and say that even if restrictions had been placed upon the privilege, either express or implied, the position which Ogden occupied in this transaction would preclude him from going into equity for any relief based upon a contract so made. Appellants are in no better situation. They cannot escape the consequences of their joint relations with Ogden by bringing this bill in their own name, omitting those of Ogden & Sheldon. This piece of strategy, instead of

helping their case, furnishes an indubitable ground for dismissing their bill for want of necessary parties plaintiff apparent upon the face of the bill. It is really trifling with the administration of justice to thus boldly, and without color of reason, violate a cardinal rule of chancery practice, as though nothing in all the wide domain of law could be regarded as definitely settled beyond controversy.

We have arrived at the following conclusions : 1. Appellants had no copyright at common law in the copy of Davie's atlas they purchased of him. 2. If they acquired any by the accession of subsequent matter in accordance with Davie's plan, then, by the sale to the city of Chicago of the privilege of making a copy for public use, without restriction, by contract, they thereby lost their copyright in such new matter, and it became the common property of the community. 3. By Ogden's position as member of the common council and of the finance committee, and his interest in the subject matter, and his conduct in making the contract, he is, and consequently, appellants are, estopped from setting up any alleged restrictions, and equity will not lend its aid to grant relief upon alleged rights arising out of such a transaction, it being, constructively, at least, fraudulent. 4. Any person, with the permission of the city authorities, may make copies of the whole, or any part, of the maps belonging to the city and obtained under the privilege so purchased of appellants and Ogden & Sheldon. The appellants' bill was properly dismissed upon the merits, and the ground that Ogden & Sheldon were necessary parties, therefore the decree of the circuit court will be affirmed.

*Decree affirmed.*