## PROPERTY IN PROCESSES REQUIRING EXPERIENCE, SKILL AND KNOWLEDGE.

Common Pleas Court of Cuyahoga County.

THE CLEVELAND WORM & GEAR CO. v. MAYHEW E. NOYES.

Decided, May, 1915.

*Trade Secrets—Involved in the Art of Making Worm Gear Drives—Processes of Manufacture May be Clothed with Property Rights—Knowledge Obtained in Practice—Distinguished from that Derived from the Books or Possessed by Technical Experts—Employees Under Obligation to Treat Such Knowledge as Held in Trust—Bound by an Implied Contract Not to Use Such Knowledge to the Injury of their Employers.*

A shop foreman, who while so employed has obtained an intimate knowledge of a superior manufacturing process, upon leaving such employment may be enjoined from promoting a competing company or using his knowledge so obtained, or drawings pertaining to such process which came into his possession, in connection with a competing business; but he can not be enjoined from obtaining a patent on a mechanism used in such process, application for which he already has on file.

*White, Johnson, Cannon & Neff,* for plaintiff.
*Francis J. Wing,* contra.

FORAN, J.

In this case the plaintiff asks for an injunction and the appointment of a receiver. In brief, the claims of the plaintiff are, that it is a corporation organized under the laws of Ohio, located at Cleveland and engaged in the business of manufacturing worm gear drives for the propulsion of automobiles and motor vehicles of the tractor and pleasure type; that it has been engaged in this business for several years, and has built up a large, profitable and constantly increasing business. That the worm gear drive is an efficient and mechanical method of applying power, or for the transmission of power, and is gradually coming into greater use and rapidly displacing other methods of

power transmission in or for such vehicles; and that about January 8, 1914, the defendant, Mayhew E. Noyes, was employed by the plaintiff as shop foreman, and continued as such shop foreman until March 13, 1915, when he was discharged by the plaintiff for alleged misconduct in permitting strangers to come into the factory and view its operations, and in making copies of important and valuable data belonging to the plaintiff, and abstracting other papers of like import. The plaintiff further claims that its superintendent, David Fitzpatrick, and a corps of engineers and assistants, through long years of practical experience, by repeated experiments and knowledge gained from numerous failures and successes, finally perfected methods and processes which enabled the plaintiff to manufacture worm gear drives of unequalled and unrivaled excellence and efficiency, adapted to all kinds of motor vehicles and all conditions of topography, load and speed; that these methods and processes are peculiar to the plaintiff's business, are to a large extent secret in the broad sense that they are kept from the knowledge of others and concealed from the notice of all except the person directly charged with the special confidence of the plaintiff, and under strict obligations of responsibility to it.

There is no claim that the methods, processes, workmanship or modes of construction of worm gear drives by the plaintiff are in any sense esoteric, occult or mysterious; but the plaintiff, it is claimed, by its experimentation, long experience and observation, has acquired and is possessed of mechanical and engineering principles by the application of which the difficulties and defects of worm gear drive power transmission are practically solved; and that this knowledge enables it to successfully compete in the open market with all other manufacturers of such means of power transmission for motor vehicles. Its complaint against the defendant, briefly stated, is, that the defendant was employed by it as its foreman, and that in the course of his employment he necessarily became acquainted with certain things the keeping secret of which was important and valuable to the plaintiff; that is, that by reason of his employment he became acquainted with the modes and methods used and

adopted by the plaintiff in the construction of-worm gear drives; that he was about to make use of these for his own advantage; that the specific things which it is claimed the defendant appropriated and took from the plaintiff are: a list and description of hobs used for cutting worm gear wheels; a list and description of cutters used in cutting hobs and the worms of such worm gear drives; data sheets given to him as foreman and containing instructions how to manufacture hobs and how to use hobs and cutters in the manufacture of worm gear drives; blue prints which were used for the same purpose, as well as information as to the names and addresses of persons and corporations for which worm gear drives were designed and manufactured by the plaintiff; and also particulars and details as to a worm-grinding machine invented by the plaintiff's superintendent, the claim being that the invention belongs to the plaintiff, which it is said the defendant had been employed to assist in constructing while in the plaintiff's employment.

A temporary restraining order was granted by Pearson, J., March 30, 1915. The matter is now before the court on motion to dissolve that restraining order. The defendant has filed no answer. It is admitted that he was foreman, as claimed in the plaintiff's petition, that he made a list and description of the hobs, which he offers to return. He admits that he intends to form a company to compete with the plaintiff in the manufacture of worm gear drives, and that he has made arrangements for so doing, which he proposes to carry into effect. He admits, or rather claims, that he has made certain improvements in the machine used for the grinding of worms, and that he has already applied for a patent on this device, claiming that it belongs to him. He does not deny that he has acquired certain knowledge while in the employment of the plaintiff which may enable him to better do as he proposes to do, that is, to manufacture worm gear drives in competition with the plaintiff; but he claims that such knowledge is not a secret, but with the information contained in books and the general knowledge of expert mechanics applied to what is contained in books, and technical magazines, successful and serviceable commercial worm gear drives can be manufactured by any expert engineering mechanic.

We think it would be a waste of time, if the court had the time, to give even a summary of the evidence introduced during the trial, which occupied some six or seven days. The record is very voluminous, the inquiry taking a very wide range, much of the testimony being wholly immaterial and throwing but little light upon the main issues involved. We feel that it is only necessary to the inquiry before us to state the conclusions which we believe the testimony has conclusively established.

The work of Hugh Kerr Thomas, introduced in evidence, furnishes this definition:

"A worm gear may be defined as a spur wheel which is rotated by an endless rack, the teeth of which are successively pressed against the teeth of the wheel. By making the rack teeth in the form of a spiral and rotating it upon its axis, sloping the wheel teeth to a corresponding angle, the effect of an infinitely long rack is obtained."

A rack of this kind is called a parallel worm. The author further says:

"By revolving the worm wheel, the teeth of the rack may be caused to move along, that is to say, the worm will itself commence to rotate, the relative motions being thus convertible."

The principle itself is very old, harking back to Archimedes, who died 212 B. C.; but no one will claim that its possibilities, uses and adaptations have not been tremendously enlarged. The testimony seems to clearly indicate that it is a well-known principle of mechanics that helical teeth and worm transmission of force increases smoothness of motion, especially in motor vehicles; but smoothness of motion requires difficult and expensive workmanship. Helical teeth are open to the objection that they exert a laterally oblique pressure, which tends to increase resistance and strain machinery. To minimize this laterally oblique pressure and decrease resistance and strain requires very skilful workmanship and nice discrimination and close care and attention to mechanical details; and this is more particularly true where high speed and smoothness of motion are

desired. When it is sought to transmit force and motion from a prime mover through the train of mechanism to the working parts of a machine, so that the motion and force through the transmission may be so modified in amount and direction as to be rendered suitable for the purpose to which they are to be applied, frictional strain and resistance are large factors to be taken into consideration in attaining high efficiency. This is particularly true in the application of complex or helical motion, for here there is a combination of translation and rotation. The movement can not be said to be merely rotational, when there is translation or advance perpendicular to the plane and parallel to the axis of rotation. We think that no one will deny that greater skill, finer adjustment and closer attention to details are required in sliding contact than in rolling contact, such as belts, pulleys and band-wheels; and of all sliding contact motion, the helical being the most complex, skill and experience are factors upon which efficiency absolutely depends. If the rate of absorption of energy by a machine nearly equalled the rate at which it was produced by the prime mover, the problem of power transmission would be solved; but in the nature of things this end can never be fully accomplished, for a certain quantity of energy produced by the prime mover is necessarily absorbed by the transmitting mechanism itself for the purpose of overcoming frictional and other resistance, such as lateral oblique pressure in worm gear drives. To reduce to a minimum the quantity of energy absorbed by the transmitting mechanism and obtain the highest possible efficiency, both as to speed and load, was the problem that confronted mechanical engineers in the application of worm gear drives to motor vehicle propulsion.

If the testimony in this case is to be believed, they have successfully solved the problem and reached the zero of absorption of energy by the transmitting mechanism. It appears in evidence that before pioneers in this field began to apply the principle of the worm gear to motor vehicles, the quantity of absorption of energy by such gears was over 50% of the energy produced by the prime mover, and this has been reduced to less than 3%. It is quite evident that such far-reaching results

could only be attained by long years of experience and large expenditure of money. Success was secured through experimentation and at the expense of repeated failures. All knowledge is the result of observation and experience. We gain cognition of a fact or truth by actual experience. An idea is a conception of something desired; an abstract principle of no practical consequence until established by evidence or tested by observation. Experiment subjects the thing or the object suggested by the idea to certain conditions, and by observing the result attained something new may be discovered. The manufacturers of worm gear drives for motor vehicle propulsion, through technically trained engineers, have for over ten years been subjecting these worms and gears to many varying conditions, and by observing the results have tested ideas that were suggested by repeated failures, until all the efficiency claimed has been attained. It would be sheer nonsense to say that a professor in a technicological school of admittedly large theoretical knowledge of the principles involved in worm gears as applied to power transmission, but of no practical shop experience, could produce the same results that can be produced by an engineer whose knowledge has been acquired by long years of practical experience with or in the construction of such gears for motor vehicle propulsion. The same is equally true of the man or engineer whose experience with such gears is limited to their use in devices or machines other than motor vehicles.

After fully, carefully and thoroughly considering all of the testimony, we can reach no other conclusion than that suggested.

In determining the questions under consideration, some general principles should be kept in view.

In automobiles or motor vehicles we have a combination of statics and kinetics. In most mechanical appliances the structure or form remains fixed or stationary. In motor vehicles the prime mover carries or moves the form or structure along a given path, and in designing the prime mover and the power transmission, the nature and character of the form or structure and the load it has to carry, as well as the topography of the country to be traversed, must be considered. A motor vehicle

is designed to perform work, that is, to move against resistance, largely tractive; and hence the amount and character of the resistance, such as the topography, condition of streets or roads, and character of the locality where the vehicle is to be used, must also be taken into account and provided for. Again, while there may be several threads in the worm, and many teeth in the gear wheel, it must be remembered that each thread and tooth successively stand the stress and strain of the whole load.

The pitch of the screw, which is the distance between two successive turns of the same thread or helical projection measured parallel to its axis, should be the same as the pitch in the teeth of the gear wheel, if they are to work correctly and accurately together. It is, therefore, of the utmost importance that the threads and teeth do not grind or unduly bear upon each other at any point of contact. The proper clearance must be provided for with an exactness almost microscopical. If the surface of the metal come into grinding contact, heating takes places, and the threads of the screw and the teeth of the gear wheel are destroyed by friction. It is claimed that this is prevented by a film of oil, which, acting as a cushion, keeps the surfaces separated. This film of oil is so thin that it can not be accurately measured. It has been determined, however, that there can be no metallic contact, and that this oil cushion or film must reach and remain on or upon every part of pressure contact. It will therefore be readily seen that the character and viscosity of the lubricant is a matter of supreme importance, as is also the alloy or the material of which the gear wheel is made.

A glance through the text books on the subject of worm gear drives discloses the truth of the fact, as the American Machinists Gear Book aptly puts it, that "Many of us know things that are not so." We were convinced during the hearing that there are many things about gears and worm drives that the experts do not know, but that there is nothing connected with this subject which they can not attempt at least to explain. The testimony convinces us, however, that the plaintiff has acquired and accumulated a fund of knowledge and experience on this subject, possessed, perhaps, by no other person or cor-

poration in this or any other country. That this knowledge is an exceedingly valuable asset, in which it has a property right, can not be denied. By reason of his employment, the defendant, Noyes, occupied toward the plaintiff a position of trust and confidence which he is bound by both law and morals and common honesty to respect. He says, however, that there is no secret in the process or methods of the plaintiff in worm gear drive construction; and that, given a worm gear drive made by the plaintiff, he can duplicate the same without difficulty; and inasmuch as these drives are sold in the open market, any worm gear mechanician may obtain one or secure one from an abandoned or dismantled motor vehicle and make an exact duplicate of it which will be just as serviceable and efficient as the original.

This contention is not supported by the evidence, but, on the contrary, is clearly disproved by the weight of the evidence. Counsel for the defendant strenuously insists that his client is thoroughly experienced in the details and intricacies of worm gear drives, and that the plaintiff seeks to enjoin the use and operation of the natural law of ideas.

The testimony is quite clear that, before the defendant became connected with the plaintiff, his experience in worm gear mechanism as applied to motor vehicles was quite limited. We think counsel for defendant takes too broad a view of the contention of counsel for the plaintiff, who, as we understand it, do not seek to prevent the defendant from using ideas of his own, even if they were conceived and assumed tangible shape while he was in the employment of the plaintiff; but the plaintiff does seek to prevent the defendant from appropriating discoveries or secrets or results which were the realization of effort and experience on the part of the plaintiff and its agent before the defendant became its servant.

An idea, as Locke defines it, "is the object of the understanding when a man thinks;" or it may be said to be a concept which is the product of thinking, or the mental image, the immediate object of thought. These concepts, ideas or mental pictures, which are the result of a man's thought or cognition, springing from his own consciousness and experience, belong to him to use

or make use of as he sees fit; but no man has a moral right, nor under certain circumstances has he a legal right, to appropriate ideas which another man has reduced to practice or embodied in some useful and distinct form.

Undoubtedly the defendant's knowledge of and experience with worm gear drive mechanism was greatly widened and broadened and his efficiency vastly improved by the opportunities afforded him during his service with the plaintiff. This experience and knowledge, as well as the ideas the result of his own thought, can not be taken from him, nor does the plaintiff seek to do so. The plaintiff specifically claims that this knowledge, as applied by it to pitch angles, diametrical pitch and circular pitch, adendum clearance, thickness of teeth, contact, outside diameter, oil film or cushion, and many other mechanical details in relation to these worm gear drives, have been reduced to concrete form in the shape of written data for each particular customer and each particular kind and variety of motor vehicle, and as adapted to the topography of the locality in which each is used: and that the defendant, by reason of his confidential and trust relationship to the plaintiff, wrongfully obtained possession of these data, as well as the names and addresses of its patrons or customers; and that he is about to associate himself with others to enter into competition with the plaintiff and use the knowledge thus acquired for the benefit of himself and others, and to the detriment and injury of the plaintiff.

We think this claim is fully established by the evidence; indeed the defendant does not, in many respects, expressly deny the claim, only insisting that the plaintiff never had any knowledge of worm gear drives or any methods or processes of their manufacture not known generally by manufacturers of this type of power transmission, and not found in public books and mechanical magazines on the subject; and that therefore he has a right to use not only the ideas the result of his own thought or cognition, but any ideas, details or improvements of construction originating with others; for he claims that the principle of worm gear drives is so ancient and so simple that there can not possibly be anything new or novel in connection with or in relation to it.

This contention loses sight of the fact of skill, accuracy, appropriateness, adaptation, and efficiency of workmanship and mechanical construction. This became quite evident during the trial. Counsel for the plaintiff, after the trial had been in progress but a short time, handed to the defendant data and material which had been furnished to him by an automobile manufacturer, from which it was desired to design a worm gear drive, and counsel asked the defendant if he could and would furnish the directions, as to details and data of all kinds, for manufacturing a worm gear drive to satisfy these requirements. The defendant answered he would, but day after day passed, and each morning he was asked if he had solved the problem or complied with the request, and the defendant was finally compelled to admit that he was unable to solve the problem or furnish the data or details required, from books or other general knowledge concerning worm gear drives known to mechanics generally. If the contention of the defendant is correct, it seems to the court that he should have been able to solve this problem, and that the fact that he failed to do so, and had to admit that he was unable to do so, is strong evidence that the contention of the plaintiff in respect to these matters is substantially correct.

It is said there once lived a man in a woods remote from the habitations of man, and to whose house or home there was no road or even a path; but because this man made a better mouse trap than anybody else, the public wore a beaten path to his door.

In former times, the shoemaker who could make a better boot than his fellows had the choice of the trade; nor could the less efficient man, by pulling apart the boot made by the more efficient mechanic, make a boot in all respects similar or as serviceable.

In skill and efficiency we always see evidences of the reasoning faculty, and the discrimination based upon practical knowledge, as well as occasional flashes of genius. But take the case of the skilful shoemaker: The excellence of his work may not have been wholly the result of manual dexterity. He may also have had a secret method of lasting, shrinking and stretching,

which could be imparted to others, but which could not be derived from the most careful examination of his work.

About two hundred years ago Antonio Stradivari made violins at Cremona, Italy, that can not be duplicated and never have been. There are over fifty specimens of this man's workmanship still in existence, whose special advantage, whatever it was, has been lost irrecoverably. Violins of this make have been taken apart and microscopically studied, the proportions and details faithfully followed by the careful workmanship of skilled hands, but the quality of its tone, its soul or the heart of its mystery has never been reproduced or discovered. Some little detail of seasoning or varnishing, or some secret process of handling, has been lost and probably never will be found.

In *Tube Co.* v. *Tube Co.*, 29 O. C. C., 468 (3 C.C.[N.S.], 459), Donahue, J., defines a trade secret to be "a plan or process, tool, machanism or compound known only to its owner or those of his employees to whom it is necessary to confide it in order to apply it to the uses intended." There are other definitions of a trade secret, but this is sufficiently specific for our purpose.

The mechanism known as the worm gear drive is of course not a secret; but as between a number of such drives, that one may be more efficient and serviceable than the others admits of no doubt; and the process of making a more serviceable and efficient drive may well be secret or involve a series of secrets. Process in this connection means the actions, operations and methods of treatment applied to the construction of the screw or worm and the gear wheel and fitting it all to work synchronously so as to attain the most efficient result. In a word, it means the whole course of proceeding from the time the plan as conceived is drawn until the finished product is encased in the lubricant and placed in position for operation. Just what this secret is, or what the secrets are, it may be difficult from the evidence to state in precise words; it may be in that skilful and accurate workmanship which produces perfect synchronization between the different parts, or such as provides for a perfect oil film or cushion, or it may consist in a series of adaptations which produced the results established by the evidence.

Under all the circumstances detailed in the evidence, it appears clear to the court that the relation of trust and confidence existing between the plaintiff and defendant was of such a character as establishes an implied contract that the defendant would not do the things the evidence conclusively shows he has done and proposes to do.

*Merryweather* v. *Moore*, L. R. (1892), 2 Chancery Division, 518, is a case in point. It seems that two days before leaving the plaintiff's employ, the defendant compiled a table of dimensions of various types of fire engines made by the plaintiff, which dimensions the plaintiff claimed to be trade secrets. The defendant claimed that he prepared the table for his general information; and further, that all the information contained in the tables might be obtained by measuring up engines which had been sold by the plaintiff. Among other things the court said:

"I will put aside once for all any cases arising on express contract. Perhaps the real solution is that the confidence postulates an implied contract; that, where the court is satisfied of the existence of the confidential relation, then it at once infers or implies the contract arising from that confidential relation—a contract which thus calls into exercise the jurisdiction to which I have referred.    *    *    *

"It may be that with care all these details might have been obtained by inspection of the different engines which were either at hand or available, perhaps, through working drawings, or otherwise; but in this particularly compendious form it is common ground that these materials did not exist. Mr. Moore considered it to be for his benefit that they should exist, and exist in his possession; and he must be taken, whatever he says, to have intended to use them for his own purposes.    *    *

" But the question is, is not this an abuse of the confidence necessarily existing between him and his employers—a confidence arising out of the mere fact of his employment, the confidence being shortly this, that the servant shall not use, except for the purposes of the service, the opportunities which that service gives him of gaining information."

There is much in this language that is quite applicable to the case before us.

In *Lamb* v. *Evans*, L. R. (1893), 1 Chancery Division, 218, at 226, the court say:

"What right has any agent to use materials obtained by him in the course of his employment and for his employer against the interest of that employer? I am not aware that he has any such right. Such a use is contrary to the relation which exists between principal and agent. It is contrary to the good faith of the employment, and good faith underlies the whole of an agent's obligation to his principal. *. * * An employer gives to his agent by employing him the means of obtaining in his name and for the purposes of the contract certain materials and certain information which has been committed for the purposes of that contract to writing. It is intelligible that the bargain made between the principal and agent should be any other than one which implies that the agent, having obtained these materials and information under the cover of this agency, is not to turn around and use the materials against his employer as soon as the agency is determined."

In *Little* v. *Gallas,* 4 N. Y. (App. Div.), 569, it is said:

"The law raises an implied contract that an employee who occupies a confidential relation towards his employer will not divulge any trade secrets imparted to him, or discovered by him in the course of his employment."

See also to the same effect *1 High on Injunction,* Section 19; *1 Beach on Injunction,* Section 35.

The authorities that might be quoted in support of this proposition are almost innumerable.

It appears from the evidence that a cutter is a tool for cutting a worm or screw, and also for cutting the hob. The angle at which the cutter is placed in the machine determines the lead of the screw, as well as its general character, and the kind and character of hob which it is desired to make. A hob is a tool for cutting the teeth of the gear wheel. The character of the worm or screw depends, as has been said, upon the angle at which the cutter is set. The hob for each patron or customer of the plaintiff has a number; and the character and kind of cutter used for each of the plaintiff's patterns is also indicated as well as the number of the cutter. These hobs and cutters were kept in a vault or other secure place under lock and key; doubtless they were not available to anybody except upon an order from the

engineering department. When a shop order was given the defendant in his character as foreman, it contained certain data as to the number of the hob, cutter, circular pitch, pitch diameter, adendum, and other data from which the order could be filled or the worm gear drives made. The defendant kept this data in a memorandum book. This he admits. The blue prints and drawings which accompanied each shop order, or which were furnished the defendant for each new job or order, were also in his keeping, and it is claimed by the plaintiff that they disappeared at the time he left the plaintiff's employment or was discharged. The defendant admits that he obtained a list of the customers of the plaintiff from the shipping office. Having all this data, and knowing the names of the customers, the number of the hob and cutter, together with the drawings and blue prints, the information furnished by all this data is exceedingly valuable to the defendant if he be permitted to retain it.

It may be said, however, that defendant denies that he made a list or copy of cutters, although some of the plaintiff's witnesses insist that he did.

It seems that the blue prints and other data, such as shop orders, were in the defendant's desk during the time he was employed, and were kept there; and that a day or two after he left, and when these things were sought for by the agents of the plaintiff, they could not be found, although diligent search has been made for them.

Counsel for defendant relies largely upon the case of *National Tube Company* v. *Eastern Tube Company*, 23 O. C. C., 468, *supra*. In the second paragraph of the syllabus of this case it is said:

"The fact that the discoverer of a trade secret which he is using secretly communicates to an employee to better enable the latter to discharge his duties as such, does not authorize such employee to sell it in the market, nor to sell his services with the added value of the secret; but if the employee himself knew the idea, or brought the knowledge to his employer, the only property interest the employer can claim is the product of the skill, indus-

try and intelligence of the workman. He does not own the idea.''

With this doctrine there can possibly be no quarrel.

In this case it seems that the defendant was employed by the plaintiff, who claimed that during the term or course of his employment the plaintiff had perfected through various stages of evolution certain patterns that were strictly individual and distinct from the patterns of all other tool mills. That the defendant occupied toward it a confidential relation, and that he wrongfully, fraudulently and secretly took and carried away the patterns of the plaintiff, and had certain castings made for the use and benefit of another company; and that he could not have secured these patterns except by reason of his confidential employment.

The defendant, Nuttall, denied that the patterns were a trade secret, and avers that these and like patterns were in common use; that artisans or workmen in that line of business had full knowledge of the character of the machinery and of the patterns, and could easily and readily reproduce them.

During the trial one of the witnesses, in answer to a question with respect to these patterns, said it was a question of engaging a competent engineer and a man to do the work. The court in the opinion, page 472, say:

"That there was some care taken of these patterns, and some intention of keeping them from the public generally, there can be little doubt; but a trade secret, as we said a moment ago, is a secret known only to the owner or proprietor of it and such of his employees to whom it is necessary to communicate the secret in order that he may use them to advantage. It does not mean that when I employ a man who has skill, knowledge and experience in a particular line, and ask him to furnish me the knowledge, and employ him because of his knowledge and experience, and he then supplies me an article, or does for me that which his skill, knowledge and experience enable him to do, the idea or ideas he evolves become the property of the employer as a trade secret."

In other words, it seems in this case that the defendant, and perhaps other employees, evolved the idea or ideas embodied in

these patterns; and the court distinctly holds that, under such circumstances, the ideas do not become the property of the employer as a trade secret, for the court says the trade secret must be in the mind of the man who discovers it, and he must be using that secretly; and the communication to his employee must be made, if possible, as has been said, to better enable that employee to discharge his duties. Of course the employee, as the court in this case said has no right "to sell it in the market," or to sell his services in the market with the added value of that secret. But if the employee himself knew the thing, if he is the owner and brought the knowledge to the employer, the only property interest that the employer may claim is the product of the skill, industry and the intelligence of the workman.

In sharp contrast to this case is the case of *Tabor* v. *Hoffman*, 118 N. Y., 34. The plaintiff, Tabor, was a manufacturer of pumps, which were sold upon the market. He claimed to have a secret process of so doing, that is, in making the perfected pump, but did not obtain the protection of the patent laws; and the court say, page 35:

"As the plaintiff had placed the perfected pump upon the market without obtaining the protection of the patent laws, he thereby published that invention to the world and no longer had any exclusive property therein." Citing *Rees* v. *Pelzer*, 75 Ill., 475; 14 Fed., 728.

The court then proceeds to say:

"But the completed pump was not his only invention, for he had also discovered means, or machines in the forms of patterns, which greatly aided, if they were not indispensable, in the manufacture of the pumps. This discovery he did not intentionally publish, but had kept it secret, unless by disclosing the invention of the pump he had also disclosed the invention of the patterns by which the pump was made. * * * The pump consists of many different pieces, the most of which are made by running melted bars of iron and brass in a mold. The mold is formed by the use of the patterns, which exceed in number the separate parts of the pump, as some of them are divided into several sections. The different pieces out of which the pump is made are not of the same size as the corresponding patterns,

owing to the shrinkage of the metal in cooling. In constructing patterns it is necessary to make allowance not only for shrinkage, which is greater in brass than in iron, but also for the expansion of the completed casting under different conditions of heat and cold, so that the different parts of the pump may properly fit together and adapt themselves, by nicely balanced expansion and contraction, to pumping either hot or cold liquids.''

This is precisely the situation before us. In the Tabor case, taking the perfected or manufactured pump which was placed upon the market apart, a similar or precisely similar pump could not be reproduced, because of the conditions indicated by the court. The size of the patterns could not be discovered by merely using different sections of the pump, because of the shrinkage of metals, as indicated; and various changes had to be made if a perfected pump was to be built, and these changes could only be ascertained by a series of experiments involving the expenditure of both time and money; and this is precisely what is claimed in the case before the court.

Vann, J., in *Tabor* v. *Hoffman, supra,* said:

''Are not the size and shape of the patterns, therefore, a secret which the plaintiff has not published, and in which he still has exclusive property? Can it be truthfully said that this secret can be learned from the pump when experiments must be added to what can be learned from the pump before patterns of the proper size can be made?''

And it is frankly admitted in the case before us that to make a serviceable and efficient gear or worm gear drive, experimentation is absolutely essential, as there are many variable conditions under which the worm gear drive has to be used. In the Tabor case the court further said, speaking about a valuable medicine not protected by a patent:

''If one finds out the secret of the proprietor, he may use it to any extent that he desires without danger of interference by the courts. But, because this discovery may be possible by fair means, it would not justify a discovery by unfair means, such as the bribery of a clerk, who in course of his employment had aided in compounding the medicine, and had thus become familiar with the formula.''

There can be no doubt, in fact it is conceded by every one that, independent of copyright or letters patent, an inventor or author has, by the common law, an exclusive property in his invention or composition until by publication it becomes the property of the general public   Authorities need not be cited in support of this proposition.

Counsel for the defendant claim that the case of *Tube Co.* v. *Tube Co., supra*, is *in pari passu* with the case before the court; but as has been said, an examination of the case does not sustain this claim, for it seems the employee or the servant, and not the owner or employer, thought out or originated the idea or ideas which found expression in the patterns.

That a trade secret is a species of property will not be denied. The word property embraces money, debts, choses in action of every kind, as well as things that are visible or tangible. *Stahl* v. *Webster*, 11 Ill., 68; *Chadwick* v. *Covell*, 151 Mass., 190; *Watkins* v. *Landon*, 52 Minn., 389.

A secret process and an article made under it are separate and distinct things, and each is subject to ownership.   The rule of law governing the matter is concisely stated in *Hartman* v. *Park & Sons Co.*, 145 Fed., 358.   Number 1 of the syllabus says:

"The patent and copyright statutes, in conferring upon an inventor or author the exclusive right to make, use and sell articles embodying his invention or authorship, create in him a new right, and do not sustain or continue the previously existing right.   The owner of a secret process not patented has no such exclusive right to make, use and vend the article to which it relates, but he has the right to keep his knowledge to himself and to the protection of same as the property right against one who, in violation of contract or through a breach of trust or confidence, undertakes to apply the secret process to his own use or to impart it to others."

An interesting case will be found in 114 Mich., 149-160.   This is the case of *Owen W. Thum Co.* v. *Tloczynski*.   It seems from the facts in this case that the process and machinery used by the proprietors of the business were regarded as secret and of great value.   Much care was taken to exclude the public from the means of obtaining the knowledge of the processes, and when

new machinery was to be constructed a part of it was got at one place and part at another, so that no person outside of the proprietors and their immediate employees should see a complete machine in operation. The employees in one department were not allowed in the other departments, and great care was taken to prevent them from obtaining knowledge of any branch of the business except that in which each was immediately engaged. At the time the defendant was employed in the business he knew of these facts, and it was held that the employment was upon an implied agreement that the defendant would not disclose or make improper use of the secrets of the business.

In the prayer of the petition it is asked that the defendant be enjoined "from attempting to procure a patent on said improvement and grinding machines, or communicating information in relation thereto to any other person or persons, natural or artificial; and to deliver to such receiver, for the purpose aforesaid, any written drawings or specifications in relation thereto."

The testimony discloses that the defendant made application for a patent on a worm grinding machine, through his attorney, in August, 1914, and that the application for such patent was filed in the patent office at Washington, D. C., as of December 26, 1914, over three months before the petition was filed. The defendant claims he had drawings partially prepared for this machine some months before he entered the employment of the plaintiff, and so informed Mr. Fitzpatrick, its superintendent. In this he is supported by the testimony of another witness who claims he saw a drawing or plan of the machine at the defendant's house, perhaps in August, 1913. The testimony as to this grinder is not only conflicting but confusing. In everything relating to it the parties are in sharp conflict. As the testimony was received the court was first impressed with the conviction that the main and principal features of the machine originated with the defendant. It is admitted that the plaintiff, through its superintendent, David Fitzpatrick, began to build a worm grinding machine some time before the defendant entered its employment. The base or structural parts of the machine had been cast, and it had been so far constructed that tentative efforts had been made to operate it, not perhaps in actual work, but for the

purpose of determining its practicability to the ends for which it was designed.

The defendant claims that on January 6, 1914, he exhibited to David Fitzpatrick and his son Clarence, at the plaintiff's shop in Cleveland, Ohio, the drawings or a drawing of the machine practically as it was finally constructed. He stated that he was positively certain as to the date, for he says that he wrote on the drawing itself, on the day that he exhibited it to these gentlemen, the following words: "M. E. Noyes, 1-6-14, shown to Mr. D. & C. Fitzpatrick." That is, that the drawing was shown to Messrs D. and C. Fitzpatrick on January 6, 1914. This endorsement is in the defendant's handwriting. On that day, however, January 6, 1914, the evidence positively and conclusively shows that neither David Fitzpatrick nor his son Clarence Fitzpatrick was in the city of Cleveland; that Clarence Fitzpatrick left the city January 3d or 4th, 1914, and was in the city of New York January 5, 1914, in attendance at an automobile show then being held in that city; and that he remained there until **January 11, 1914.** This appears from the diary kept by Clarence Fitzpatrick, which was introduced in evidence. The testimony also shows that David Fitzpatrick was also in New York City attending the same show from January 6 to January 11, 1914; and that he left the city of Cleveland perhaps on January 4th or 5th, 1914. This is established by proof of disinterested witnesses outside of David Fitzpatrick and his son Clarence, so clearly that there can possibly be no doubt about it.

This evidence of the defendant places him in an unenviable position. He may possibly have shown the drawing in question to David and Clarence Fitzpatrick at some time, but the fact that he testified that he made a memorandum on the drawing indicating that he had shown it to them on January 6, 1914, has the appearance at least of an attempt to manufacture testimony. When he made this memorandum he certainly knew what he was doing; and when the memorandum shows that the drawing was exhibited to David and Clarence Fitzpatrick January 6, 1914, and when from the facts in the case we know that that statement is not true, it is difficult to conceive what purpose the defendant had in view in making the memorandum, unless it was

for the purpose of preparing in advance testimony that he undoubtedly knew that he might be called upon to give.

That the defendant made valuable suggestions as to the construction of this machine, is quite evident.  The automatic indexing device and other improvements upon the original conception or idea of David Fitzpatrick were undoubtedly suggested by the defendant, though David Fitzpatrick insists that these ideas were taken from worm grinding machines then in use, photographs of which were called to the attention of the defendant during the construction of the machine by him.  These photographs are in evidence, and bear a striking resemblance to some of the parts of the machine as finally constructed.  Strictly speaking, there may be nothing really new or novel in this machine.  The details of its parts do not fall within the purview of new contrivances applied to new ends, but rather to new combinations of old parts; that is, it consists in the combination, in a new form, of well known mechanical devices which grind worm threads in a more satisfactory manner than had been previously done, and for this reason it may be patentable.  On this phase of the case the difficulty is not with the evidence, but rather with the law, so far as the prayer of the petition is concerned.

While it is true that state courts may have jurisdiction to pass judgment upon the title and validity of patents, this jurisdiction seems to be limited to cases where the defendant claims, incidental to his defense, the invalidity of a patent that may be involved in the controversy (*Pratt* v. *Light & Coke Co.*, 168 U. S., 255).  The defendant filed his application for a patent on this machine three months before this action was commenced; and for aught that the court now knows, a patent may be granted on this application without any further action upon the defendant's part.  The commissioner of patents is something more than a mere administrative official.  He is the final judge, so far as the patent office is concerned, of all controverted questions arising in his office so far as granting or withholding patents is concerned (*Robinson on Patents*, Vol. 1; p. 84).  To this extent the commissioner of patents performs judicial functions.  The patentability of this device and the question of who originated the

idea of new combination of old parts to obtain a desired result is now before the patent commissioner. If David Fitzpatrick conceived and originated this idea, he may, by filing his application in the patent office, cause an interruption in the course of proceedings, and thus raise the question of interference and have the matter adjudicated in the patent office. Or if, by reason of any contract relation he had with the plaintiff, the plaintiff is entitled to the discovery if made by David Fitpzatrick, then the plaintiff may manufacture these machines and resist an application for an injunction by the defendant, provided the patent is allowed to him.

Section 711 of the United States Revised Statutes vests exclusive jurisdiction in the federal courts "of all cases arising under the patent right or copyright laws of the United States." This language seems broad and sweeping. Even if the defendant's conduct could be treated as an infringement on the rights of David Fitzpatrick, the federal court could not entertain it, for equity has no jurisdiction to enjoin the infringement of an invention before a patent has been issued, notwithstanding an application has been made and is pending in the patent office.

*Rein* v. *Clayton,* 37 Fed. Rep., 354: In this case it is said in the syllabus that:

"To constitute an action when arising under the patent-right laws of the United States, the plaintiff must set up some right, title or interest under the patent laws, or at least make it appear that some right or privilege under those laws will be defeated by one construction or sustained by the opposite construction of those laws."

Undoubtedly, as between David Fitzpatrick and the defendant, the question of priority of discovery is involved; and the claim of David Fitzpatrick or the plaintiff in this action is that a right, that is, the right of discovery, will be defeated if the defendant is permitted to obtain a patent for the grinder machine. But as has been said, this involves the question of priority of discovery, and we believe that that question is one arising under the patent laws of the United States.

In *Murjahn* v. *Hall,* 119 Fed., 186, the complainant alleged that he was the inventor of a new kind of water paint, which he

was engaged in selling in large quantities; that he was induced to disclose his invention to the defendant on his promise that he would keep it secret and would purchase large quantities of the paint from the complainant; that the defendant, in violation of this agreement and without complainant's consent or knowledge, obtained a patent for the paint composition as his own invention, from which he derived large profits. It was held that "Such bill stated a cause of action against the defendant for an accounting and an injunction, and for an adjudication of the invalidity of the patent."

So that it will readily appear that if the plaintiff herein, or his agent, David Fitzpatrick, was the real inventor or discoverer of the worm grinding machine, he is not without remedy, even if the defendant should obtain a patent on the machine. In the case last cited there was no diversity of citizenship, so that the subject-matter of the litigation was the only thing of which the court had jurisdiction; and the fact that the court entertained jurisdiction is tantamount to saying or holding that a state court would not have such jurisdiction, and that the case was one arising under the patent laws of the United States.

*Curtiss on Patents*, Section 49, is cited by counsel for the plaintiff, and so far as the rule of law therein enunciated is concerned, the doctrine is unquestionably sound; and that is, if David Fitzpatrick, in his capacity of employer, or as the vice-principal of the plaintiff, conceived the result embraced in the worm grinder, or the general idea of the machine, he will be regarded as the inventor, even though he employed and used the manual dexterity and inventive skill of the defendant in the mechanical details and arrangements necessary to carry out the original conception; and this even though the defendant has made valuable additions which resulted in an improvement on the original conception or design or idea of David Fitzpatrick.

With this doctrine there can be no controversy. Many cases or authorities to the same effect are cited in the excellent brief of the able and learned counsel for plaintiff. Indeed, taking the testimony as a whole, and in view of the palpably obvious attempt of the defendant to strengthen his case by the statement, glaringly false if premediated, that he submitted a drawing of

the machine to David Fitzpatrick and his son Clarence on January 6, 1914, we are morally convinced that the germ or root idea of the worm grinder originated with and was conceived by David Fitzpatrick before the defendant became shop foreman for the plaintiff. Blue prints of the device as formulated in the mind of David Fitzpatrick had been made and sent to a patent attorney for an opinion as to its patentability before the defendant was employed as shop foreman. A patent was not applied for because details had not been perfected, and the defendant was requested to assist in perfecting these details. To this end, such of the shop force as was necessary and all required materials were placed at the defendant's disposal, and during all of the time he was employed in constructing the machine on which he has applied for a patent he was being paid wages by the plaintiff.

It is true, and is a well-recognized legal principle, that when an employee in a certain line of work devises an important method or implement for doing the work, and uses the employer's property and time to put his invention into practical form, and he permits the employer to use the invention, he will thereby give him such a license to use the invention as will disentitle him to enjoin his employer as an infringer of the patent. This is what is known as shop rights. But if David Fitzpatrick really originated the idea, or discovered the method or combination of old devices or parts to a new application, the fact that he might use the plaintiff's work would be poor consolation.

In the device constructed before the defendant was given charge of its reconstruction, the indexing was manual, and by indexing is meant placing the emery wheel in the next succeeding thread to be ground. As perfected, it is automatic, an admittedly valuable improvement; but as has been said, plaintiff claims the idea of automatic indexing was suggested by other similar devices, photographs of which were called to the attention of the defendant by David Fitzpatrick. It is not denied that David Fitzpatrick worked on this device for over a year before it was turned over to the defendant to be reconstructed. The necessity for a new and improved worm grinder was evi-

dently deemed imperative by the plaintiff for many years. Certain movements, for instance the carriage movement, in the old device were accomplished by what was called a pilot. In the new machine or device a gearing wheel takes the place of the pilot. This is, however, a matter of detail; the idea remains the same, that is, that there had to be a carriage to carry the worm to be ground up to the emery wheel. In the device as first built the reverse was made by means of a stop, pulleys and belts. In the new device as built by the defendant the reverse is different, and improved undoubtedly, but still it is only a means by which the carriage is reversed and brought back to start over again so as to grind the next thread of the worm.

The whole question resolves itself into this proposition: David Fitzpatrick had a clear idea of what he wanted, or what device he wanted to grind worms. This idea took form and shape under his direction as a structure or machine which, upon testing, demonstrated certain defects or showed certain defects; but these very defects suggested ideas for their removal or remedy. Practically all inventions are the result of repeated trials. The inventor knows what he desires to accomplish; the idea assumes tangible form in the shape of a device. It may prove defective on trial or test, but observation of the defect or defects frequently unerringly points out the road to success. But admitting that David Fitzpatrick originated and conceived the root idea embodied in this grinder, we can not see our way clear to enjoin the defendant "from attempting to procure a patent on" it, the application therefor having been filed in the patent office three months before commencement of this action. The patent office can not possibly be restrained from considering and passing upon the application. If the patent office should pass favorably upon this application, as it may at any time, it would be a vain thing to enjoin the defendant from attempting to do that which he has already done, that is, provided nothing further is necessary to be done or may be required of him. We do not believe the authorities cited by learned counsel for plaintiff sustain his contention in this respect.

If a man is sued in the state courts upon a promissory note, he may plead want of consideration. This is elementary. If the

consideration was the assignment of a patent or rights therein, and the patent was void or of no possible value, that fact may be shown by way of defense; because if the patent was void or of no possible value, then there was no consideration for the note. The validity of the patent for which the note was given is merely incidental to the defense, and to deny the defendant the right to plead and prove that fact would be a denial of justice. The state court having jurisdiction of the subject-matter, and there being no diversity of citizenship, the defense could not be denied without ousting the state court of its jurisdiction.

This was the question in *Darst* v. *Brockway,* 11 Ohio, 462.

In *Blakeney* v. *Goode,* 30 O. S., 350, the action was for damages for breach of contract, the defendant having agreed, for a sufficient consideration, to use his skill as a machinist to make a patent article as salable and profitable as possible. The validity of the patent was conceded, and it could not be said in any sense that the controversy or cause of action was one "arising under the patent right or copyright laws of the United States."

In *Wilson* v. *Sanford,* 10 Howard, 99, the court in the opinion said:

"The dispute in this case does not arise under any act of Congress; nor does the decision depend upon the construction of any law in relation to patents."

In the case now before the court, David Fitzpatrick claims he conceived the idea of a worm grinder, and that he reduced his idea to practice and embodied it in a distinct useful form, and it therefore falls within the scope of a patentable invention.

The defendant, Mayhew E. Noyes, claims the idea was conceived and originated by him, and by him reduced to practice and embodied in a distinct patentable form. We are called upon to say or determine where the truth lies as between these men. This involves not only the question of discovery of the idea, but the priority of discovery as well. And if we had a right to pass upon these questions, we apprehend we should be governed by the rules and precedents of the patent office, based upon acts of Congress or statutes of the United States.

We think all the cases cited by counsel for plaintiff in support of the contention that this court may grant the relief prayed for in this respect are subject to similar criticism.

In view of the foregoing, the court holds that the plaintiff may have all the relief prayed for, except that of enjoining the defendant "from attempting to procure a patent on said improvement and grinding machine," that is, from procuring a patent on the worm grinder.

If it is desired that this shall be a final hearing, the defendant may file an answer and the injunction will be made perpetual; and an entry will be made to that effect, and the plaintiff and defendant given an exception.