**CARTER PRODUCTS, Inc., Joseph G. Spitzer, and Marvin Small**

v.

**COLGATE–PALMOLIVE COMPANY, Noxzema Chemical Co., Inc., Stalfort Pressure-Pak Corporation, John C. Stal-fort & Sons, Inc., and Read Drug & Chemical Company, Inc.**

Civ. A. No. 6954.

United States District Court, D. Maryland.

March 10, 1955.

R. Dorsey Watkins, of Piper & Marbury, Baltimore, Md., George B. Finnegan, William D. Denson and Jerome G. Lee, of Morgan, Finnegan, Durham & Pine, New York City, for plaintiffs.

Harry N. Baetjer and H. Vernon Eney, of Venable, Baetjer & Howard, Baltimore, Md., Benjamin B. Schneider, Chicago, Ill., Trenton Meredith, Jersey City, N. J., for Colgate-Palmolive Co.

H. Paul Rome and H. Paul Black, Baltimore, Md., for Stalfort Pressure-Pak Corp. and John C. Stalfort & Sons, Inc.

H. Vernon Eney, of Venable, Baetjer & Howard, Baltimore, Md., for Read Drug & Chemical Co.

COLEMAN, Chief Judge.

This is a suit based upon United States Patent No. 2,655,480, issued October 13, 1953, on application filed No-

vember 2, 1949, to Joseph Spitzer, Irving Reich and Norman Fine. The corporate plaintiff, hereinafter called Carter, is the exclusive licensee under the patent which, in the words of the patent itself, "relates to a composition for use in producing a soap or a detergent lather without resorting to any manual or mechanical whipping or agitating operation".

More specifically, it embraces a pressurized self-generating lather composition in a small can with a press-button, outlet valve which Carter manufactures and markets as a shaving preparation under the name "Rise". The patent hereinafter will be referred to as the Spitzer patent.

There are four defendants (a fifth, Noxzema Chemical Co., Inc., having been dismissed before trial), namely, Colgate-Palmolive Company, hereinafter called "Colgate"; Stalfort Pressure-Pak Corporation and John C. Stalfort & Sons, Inc., hereinafter referred to, jointly, as "Stalfort", and Read Drug and Chemical Company, hereinafter referred to as "Read".

The Spitzer patent embraces 21 claims, but only 8 of them are in suit, namely, Nos. 5, 6, 8, 9, 10, 15, 18 and 20, are alleged to be infringed, although all 21 are covered by defendant's counterclaim of invalidity. Colgate admits infringement of these 8 claims by one or the other of its products, known as Rapid-Shave and Barber Shave. Stalfort is charged with infringement of 5 claims, Nos. 6, 8, 9, 10 and 19, by packaging and pressurizing a self-generating shaving lather composition for the Mennen Company, called "Foam Shave", and shipping it to Mennen's customers; Read is charged with infringing by reason of selling as a retailer, Rapid Shave, Barber Shave and Foam Shave. Both Stalfort and Read deny any infringement. All defendants assert the defense of invalidity of the Spitzer patent.

In addition to denying invalidity, plaintiffs claim additional damages from defendant Colgate on the ground that it wrongfully appropriated plaintiffs' trade secrets involved in the composition of "Rise", which two of the plaintiffs, Spitzer and Small, as owners of the patent, developed jointly with the corporate plaintiff, Carter; and plaintiffs also claim that Colgate utilized these trade secrets in developing its competitive products just referred to. The two main questions for determination in the present suit are, therefore: (1) whether the Spitzer patent is valid; and, (2) whether Colgate wrongfully appropriated any trade secrets of Carter relating to "Rise". These questions will be considered in the order just stated.

### Patent Validity

In considering the question as to the validity of the Spitzer patent, it is essential, first, to understand the state of the shaving preparation art at the time "Rise" first came on the market in April, 1951, with a label bearing the words "Patent Pending" and "Secret Formula".

Prior to this time, lather for shaving had always been made by whipping air into a soap and water solution by using a shaving brush, either with the long-familiar, but now rather obsolete mug, and more recently with tubed shaving cream whipped into a lather on the face by a brush. An adaptation of this principle for the professional barber is the rather modern lather-making machine used in barber shops, where air is mechanically whipped into a soap solution to form a lather by a motorized process. All of these lathers, whether made by brush or by machine, employ ordinary air as the bubble-forming gas.

The other relatively recent and prevalent preparation to facilitate shaving is the so-called "brushless shaving cream". This forms no lather, but is merely spread on the face like cold cream, to provide a hair-softening medium and a lubricant for the razor blade. Brushless shaving creams are relatively inefficient compared with lather. They are less pleasing to use, harder to remove from the razor and the washbowl, and are in vogue primarily because of great-

er convenience, since no whipping up of lather is required.

Since the composition of the "Rise" patent is not confined to use for shaving, but expressly includes use for "shampooing or other washing or cleansing operations", it is appropriate to quote the following statement from the "Rise" patent as to what the patentees understood to be the state of the prior art in respect to shampooing: "In shampooing the hair, soap solutions are generally applied to the hair and then worked into a lather with the hands. The working up of lather delays the actual hair-washing operation and the rubbing of the hair and scalp incident to mechanically working up the lather may be undesirable in some cases."

The object of the invention and the composition employed to attain these objects are set forth in great detail in the patent, from which we quote as follows at some length, because of the highly technical character of the subject matter: "The present invention has for its object the provision of an improved composition for forming soap or synthetic detergent lather of fine quality without the use of a brush or any mechanical whipping mechanism or operation. The composition of the present invention provides a lather, such as a shaving, shampooing or washing lather, that is formed as the composition is released from its container and may be directly applied to the skin, hair, or other part or material in lather form without the use of a brush or other applying instrument and without preliminary mechanical or manual lather forming operations.

"In general, the above and other objects of the invention are carried out by employing a composition comprising a water solution of a suitable soap or like detergent and a highly volatile propellant. At least a substantial proportion of the propellant used in the mixture is insoluble in the soap solution and the two primary ingredients are mixed and maintained under sufficient pressure so that the insoluble portion of the propellant is in liquid phase, existing as droplets or in the form of a liquid-liquid emulsion in the soap solution. The mixed primary ingredients are confined at the vapor pressure of the propellant in a pressure-tight container having an opening controlled by a suitable manually operable valve. When the valve is opened, the pressure on the composition is released as it emerges from the container, with the result that a fine textured creamy lather is produced. The action is apparently such that the volatile propellant liquid, entrapped as an emulsion within the liquid solution, vaporizes upon the release of the pressure therefrom, forming fine gas cells throughout the liquid soap solution and thus forming it into a lather.

\*  \*  \*  \*  \*  \*

"The nature of the soap or detergent used, although not critical, has an effect on the type of lather produced. Suitable soaps include the soluble stearate soaps, such as the potassium, ammonium and soluble amine soaps of commercial stearic acid, particularly the triethanolamine and morpholine soaps of commercial stearic acid. The product sold commercially as stearic acid is actually a mixture consisting primarily of stearic and palmitic acid. We shall use the term 'stearates' herein to designate soaps of commercial stearic acid, although soaps of chemically pure stearic acid would be the equivalent for the purposes of this invention. The stearates may be made by neutralization of stearic acid with suitable alkali, or may be introduced in the form of animal fats, such as tallow, which are rich in stearic acid and which, when saponified, form soaps rich in stearic acid. Mixtures of the various stearate soaps may be used, and small proportions, preferably less than 5 per cent, of a less soluble soap, such as a sodium stearate soap may be used with the more soluble stearate soaps mentioned above to secure the desired consistency, particularly when the product is used to produce a shaving lather. Vegetable oil soaps, including the soaps of cocoanut oil, cottonseed oil, olive oil, soya oil, etc., may be used either alone or in ad-

mixture with the soluble stearate soaps. When the vegetable oil soaps are used alone, or as the primary soap ingredient, the resultant lather is somewhat looser, coarser and less stable than when soluble stearate soaps or mixtures including a substantial proportion thereof are employed. For this reason, when the composition is to be used for producing shaving lather, a substantial proportion of soluble stearate soap is used, whereas compositions producing shampoo or washing lathers preferably comprise or contain a substantial proportion of vegetable oil soaps. On the other hand, vegetable oil soaps may to advantage be used in admixture with soluble stearic acid soaps to prepare a shaving lather producing product for the purpose of making the soap solution less likely to gel at low temperatures than solutions made from the stearate soaps alone."

After setting forth a list of 19 examples of soap solutions recommended in preparing the patent composition, the amounts being given in per cent by weight of the soap and water solution, the propellant ingredient of the invention is also described in great detail. We quote again at some length as follows: "Generally speaking, the propellant ingredient of our invention is a volatile organic material that exists as a gas at ordinary room temperatures, exists largely as a liquid at elevated pressures practically maintainable in suitable containers for our composition and that has a low solubility in water. The propellant must be of such nature that it does not destroy the lather or decompose the lather-producing soap in solution.

"We have discovered that relatively insoluble saturated aliphatic hydrocarbons and relatively insoluble partially fluorinated and partially or wholly chlorfluorinated hydrocarbons having vapor pressures within the range from about 5 to 300 pounds per square inch gauge, and preferably from about 30 to 80 pounds per square inch gauge at 70° F., possess these properties. The propellant may be formed of a mixture of two or more such compounds which, although the individual ingredients may have vapor pressures outside the desired range, have, when combined, a vapor pressure within that range. The water solubility of the propellant or propellant mixtures should be such that they exist mainly as a liquid phase undissolved in the soap solution when the two are mixed under pressure sufficient to maintain the propellant in the liquid phase.

"Particularly when the product is used to produce shaving lather, it may be desirable to avoid the use of propellants that result in a marked tingling or burning sensation when the composition is applied to the skin. We have found that the useful lather-producing propellants are generally those with very low solubility in water. The propellant should have a solubility such that less than about 32 cc. of the propellant gas will dissolve in 100 grams of water at one atmosphere absolute pressure and about 25° C. The best propellants have a solubility of less than about 10 cc. of gas in 100 grams of water at the stated pressure and temperature. In general, the least soluble propellants produce little or no burning sensation on the skin, particularly if hydrocarbons in which the hydrogen atoms are substituted by chlorine atoms alone or by more chlorine atoms than fluorine atoms are avoided. We have discovered that the straight chain saturated aliphatic hydrocarbons of suitable vapor pressure, which comprise propane, butane, isobutane and cyclobutane are suitable lather-forming propellants and do not cause an undesirable burning sensation. The inflammability of these propellants introduces a fire hazard. Also usable, particularly in admixture with other propellants, are the saturated, partially but not completely fluorine substituted aliphatic hydrocarbons of suitable vapor pressure, such as 1, 1 difluorethane ($CH_3CHF_2$), which causes little tingling of the skin. The most desirable propellants for lather forming compositions are the substantially water insoluble chlorine and fluo-

rine substituted hydrocarbons of the proper vapor pressure range. Examples of these propellants are:

1,2 dichlor 1,1,2,2, tetrafluorethane ($CClF_2CClF_2$).
Trichlortrifluorethane ($C_2Cl_3F_3$).
Dichlordifluormethane ($CCl_2F_2$).
Monochlordifluormethane ($CHClF_2$).
Monofluortrichlormethane ($CFCl_3$).
1,1 difluorethane ($CH_3CHF_2$).
1 monochlor 1,1 Difluorethane ($CClF_2CH_3$).

\* \* \* \* \* \*

"Our composition is preferably enclosed in a container from which it is propelled as needed by the propellant gas pressure in the head space of the container. As the amount of liquid composition in the container decreases, the concentration of propellant in the liquid mixture drops due to the fact that some of the propellant evaporates to fill the increased head space. Thus, the density of the lather increases as the contents of the container decreases. For this reason, we prefer to use such a proportion of propellant to soap solution that the initial lather density when the container is substantially full lies under about 0.15 gram per cc., where the composition is to produce shaving lather. If the initial lather density is below about 0.06 gram per cc., the final lather will be dry and uneven."

The patent specifications conclude with a recital of 12 examples of stable, shaving lather-producing compositions. The ingredients, namely, (1) the soap solutions and, (2) the propellants, are given by weight when released to atmospheric pressure, at normal room temperatures. Three examples of shampoo and other lather-producing compositions are also set forth.

All of the 8 claims of the Spitzer patent that are in suit are limited to lather-forming and non-smarting propellants generally known under the trade name of "Freon". Claim 6 is limited to dichloro-tetrafluoroethane (CCL $F_2$. CCLF$_2$), which is Freon-114; claim 8 to dichlor-odifluoromethane (CCL$_2$F$_2$), which is Freon-12; claim 9 to Freon-114; claim 10 to Freon-12; claims 18 and 20 embrace a specific group of five Freons having the optimum nonsmarting and other desirable lather characteristics, including Freons-12 and -114; and claims 5 and 15 contain limitations as to the solubility and molecular structure of the propellants, for the purpose of also providing optimum characteristics in a shaving-lather composition. The characteristics of these claims will be hereinafter considered in more detail.

### A—Prior Patents.

In support of their contention that the Spitzer patent is invalid, defendants rely upon three prior United States patents, i. e., to Rotheim, No. 1,892,750, issued January 3, 1937; to Getz, No. 2,294,172, issued August 25, 1942, and to Boe, No. 2,524,590, issued October 3, 1950. Reliance is also placed upon a Swedish patent to Rotheim, No. 77,668, issued November 23, 1928, which is substantially the same as the American Rotheim patent, No. 1,892,750, issued January 3, 1937, hereinafter analysed, and also upon three other foreign patents as follows: Belgian patent, No. 487,623, to Estignard-Bluard; Argentine patent, No. 59,-548, and a corresponding Panama patent, No. 157, both to Daggett & Ramsdell, Inc.

### (1) Foreign Patents

Before taking up the three American patents above named, we will first consider the Belgian, the Argentine and the Panama patents in this order (omitting further consideration of the Swedish patent to Rotheim for the reason that it is substantially the same as the American patent issued to Rotheim which we will shortly analyse).

We turn then to the Belgian patent. Colgate maintains that it completely destroys the claim of validity of the Spitzer patent because of its subject-matter, and because it ante-dated the invention embraced in the Spitzer patent and therefore is within the prohibition of Section 102(a) of the Patent Act of 1952, 35 U.S.C.A. § 102(a). This section reads as

follows: "A person shall be entitled to a patent unless—

"(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, * * *".

In addition to documentary evidence, Carter and Colgate produced testimony of experts in Belgian patent law. This evidence clearly establishes that application for the Belgian patent was made on March 1, 1949; that on March 31, 1949, a decree was signed by the Belgian Minister of the Interior, but that the laying open of the patent to the public did not occur until July 1, 1949, i. e., 3 months later; that this was in accordance with the usual Belgian Patent Office procedure (Sections 19, 20 and 21, Belgian Patent Law of May 24, 1954, as amended), pending which the proceedings in that Office remained secret, although the inventor, under the Belgian law, might have accelerated (or delayed) the issuance of the patent, but he did not do so, with the result that, under the Belgian law, he had no right to enforce his patent until it had been laid open to the public, although once this had occurred, the effective date of the patent reverted back to the date of application for it, insofar as recovery of damages for infringement in Belgium was concerned.

On these established facts respecting the Belgian patent, it next becomes necessary to determine when, within the meaning of the words "patented * * in * * * a foreign country" (as used in Section 102(a) of Title 35 of the Patent Act, above quoted), this patent was patented in Belgium. These words have been taken without change from R.S. § 4887, and were the same in the prior enactment, R.S. § 4886, both of which enactments having been consolidated into Section 102, with lettered paragraphs in the 1952 Patent Code.

■ It is established law that in order for a foreign patent to preclude the issue of a patent in this country within the meaning of Section 102(a), the foreign patent must have become open in the foreign country to the public. As early as 1877, in Elizabeth v. Payement Company, 97 U.S. 126, at page 130, 24 L.Ed. 1000, the Supreme Court said: "A foreign patent, or other foreign printed publication describing an invention, is no defense to a suit upon a patent of the United States unless *published* anterior to the making of the invention or discovery secured by the latter". (Emphasis supplied.) I do not find this statement has been changed either by the Supreme Court or by any decision of a lower federal court in a case where the precise question has been squarely raised and decided. See Schoerken v. Swift & Courtney & Beecher Co., C.C., 7 F. 469; Robinson's Treatise on the Law of Patents, Vol. 1, Sec. 333, p. 456. Counsel for Colgate rely upon General Electric Co. v. Hygrade Sylvania Corporation, D.C., 61 F.Supp. 476; Scovill Mfg. Co. v. Balistocky, D.C., 48 F.2d 875, and Scovill Mfg. Co. v. Satler, D.C., 21 F.2d 630. However, a careful analysis of these decisions,—as to two of which (the first and the third named) no appeal was taken, and the second decision was reversed on appeal, on grounds not pertinent to the question before us,—indicates that what was said that was pertinent to the present issue was dicta.

■ The inconsistency—the inequity—of saying that a foreign patent may void an American patent, even though the former has never been disclosed to the public, is immediately apparent. Therefore, with respect to the Belgian patent, July 1, 1949, the date when it was first disclosed to the public under the Belgian Patent Office procedure, must be taken as the date when it was patented, and not March 31, 1949, the date of the Belgian decree. There is no contention that the patent was ever described in a printed publication in Belgium, as distinguished from the patent itself.

■ We therefore now turn to a consideration of what the evidence has shown with respect to the date or dates

on which the subject matter or embodiment of each of the 8 claims in suit of the Spitzer patent was first conceived, and find as follows: the embodiment of claim 5 was first conceived by the patentees on April 22, 1949, although not reduced to practice until September 18th of the same year. However, there is no proof of lack of due diligence on the part of the patentees to reduce it to practice. Therefore, the date of conception controls. Marconi Wireless Telegraph Co. v. U. S., 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731; Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163. The embodiments of claims 6 and 9 were also conceived on April 22, 1949, and while not reduced to practice until July 14th of the same year, again there is no proof of any lack of due diligence to reduce them to practice. The embodiments of claims 8 and 10 were conceived April 22, 1949, and reduced to practice May 10, 1949. The embodiment of claim 15 was both conceived and reduced to practice on the same day, i. e., May 10, 1949, and that of claim 18 was conceived on April 22, 1949, and reduced to practice between May 10 and 12, 1949. Lastly, the embodiment of claim 20 was conceived on May 23, 1949, but was not reduced to practice until September 18, 1949. However, there is no proof that this was an undue delay. It should be noted here that claims 5 and 20 embody a soap formula not even suggested in the Belgian patent, thus they need not be further considered at this point, because they cannot possibly be anticipated by the Belgian patent.

To summarize: the subject matter of each of the 8 claims in suit of the Spitzer patent was invented prior to July 1, 1949, the date when Estignard-Bluard's alleged invention was patented in Belgium. Accordingly, this Belgian patent cannot impair the validity of the Spitzer patent. Therefore, it became unnecessary at the trial to consider the subject-matter of the Belgian patent.

Turning next to the Argentine patent No. 59,548, to Daggett & Ramsdell, Inc., granted August 16, 1947, i. e., more than one year before the filing of the application for the Spitzer patent, Colgate maintains that it is a bar to the validity of the Spitzer patent on two grounds: (1) that the Argentine patent itself was "a printed publication" in "a foreign country * * * more than one year prior to the date of the application" for the Spitzer patent; and (2) that by virtue of this Argentine patent, the Daggett & Ramsdell invention was "patented" in "a foreign country * * * more than one year prior to the date of the application" for the Spitzer patent, because such a printed publication or such a patent is a bar to patentability in this country by the express provisions of Section 102(b) of Title 35.

With neither of these contentions do we agree. In the first place, the Argentine patent was not a "printed publication" within the meaning of Section 102(b). The Argentine patent introduced in evidence is a *typewritten* document. However, defendants urge that it has to be treated as printed because the Argentine law (Section 44) provides that a copy of this typewritten document can be secured by the public without charge. But Section 44 refers to Argentine patent documents as "written". A witness who testified on behalf of Carter as an expert on Argentine patent law, explained that such does provide for partial printing of a small portion of an Argentine patent, namely, the name of the grantee, the term of the patent and a "succinct account" of the invention, but that this printing is limited to the first claim and the first drawing, if any, of the patent, which are completely unrelated to the Spitzer patent, and not relied upon by defendant. The question whether somewhat similar documents satisfied the "printed publication" requirements of our patent law was decided in the negative in Permutit Co. v. Wadham, 6 Cir., 13 F.2d 454, 15 F.2d 20, by the Court of Appeals for the Sixth Circuit in 1926, which involved a form of German document known as a Gebrauchmeister. To the same effect is Permutit Co. v. Graver

Corporation, 43 F.2d 898, a decision of the Court of Appeals for the Seventh Circuit. We do not consider that Hamilton Laboratories, Inc., v. Massengill, 6 Cir., 111 F.2d 584, upon which defendants rely, is pertinent on its facts. There the court decided that deposit of a typewritten thesis in a public library in the United States constituted public knowledge in the United States. However, public knowledge in a foreign country is not pertinent to our inquiry unless embodied in a printed publication. In the Massengill case the court was not required to, and did not, decide this question. See also a recent decision of the Patent Office Board of Appeals, Ex parte Haller, 103 U.S.P.Q. 332.

Thus we conclude that the typewritten Argentine patent is not a "printed publication" within the meaning of 35 U.S. C.A. § 102(a) and (b).

■ We now turn to a consideration of the question as to whether the Argentine patent embodies an invention which was "patented" in a foreign country within the meaning of 35 U.S. C.A. § 102(a) and (b). By an analysis of these sections we have already shown that what was publicly known or used in the foreign country is not a bar to a United States patent unless such was either *patented* or described in a *printed* publication in the foreign country. Thus it becomes necessary to determine what was in fact "patented" by the Argentine patent within the meaning of section 102 (a) and (b).

■ Two alleged experts on Argentine law testified on behalf of Carter that the claims appearing at the end of an Argentine patent represent the sole scope of the patent, regardless of what may appear in the specifications. There was some deposition testimony of an alleged expert to the contrary, but the Argentine patent itself states that the exclusive property and right of the inventor is set forth in the claims. These cover only toilet articles consisting of limited ranges of proportions of propellants and perfume in the form of a homogeneous composition, which may be sprayed like an aerosol insecticide. Thus, a pressurized self-generating shaving lather is not even suggested by these claims. The three composition examples set forth in the Argentine patent, upon which defendants rely, relate to shaving creams and bear no relationship to the *claimed* subject matter of the Argentine patent, and also are unrelated to anything else in the patent specifications.

■ That nothing is to be treated as patented by a foreign patent except what is actually claimed therein is well settled under our decisions. Leeds & Cattin Co. v. Victor Talking Mach. Co., 213 U.S. 301, 29 S.Ct. 495, 53 L.Ed. 805; Permutit Co. v. Wadham and Permutit Co. v. Graver Corporation, supra. See also Atlas Glass Co. v. Simonds Mfg. Co., 3 Cir., 102 F. 643; General Electric Co. v. Alexander, 2 Cir., 280 F. 852; Springham's Outline of Patent Law, 1937 Edition, page 203, and Revise & Caesar, Patentability and Validity, 1936 Edition, page 108.

Turning to the Panama patent, since this is also a typewritten document, with claims identical with those in the Argentine patent, and since the uncontradicted testimony of an alleged expert on Panama patent law is to the same effect as that of the weight of the credible testimony relative to the Argentine patent law, the same conclusion is required with respect to both documents, namely, that neither of these Latin-American documents is a "printed publication" or "patented" within the proper interpretation of those words as contained in section 102(a) and (b) of our patent law. It thus became unnecessary to consider the subject-matter of these patents.

It is to be noted that these patents were the result of abandoned experiments, which will hereinafter be referred to, conducted in the New York laboratories of Daggett & Ramsdell, a subsidiary of the Standard Oil Company of New Jersey. No application for a United States patent on the alleged inventions has ever been made. What presumably happened was that when these

patent applications for pressurized perfume spray were about to be filed in Argentine and Panama by a Doctor Fiero, these Segelken formulae were grafted onto the foreign applications, with the idea, presumably, that a Convention date might be established to support a United States patent application for them at a later date.

### (2) United States Patents

We turn now to an examination of the three United States patents which defendants assert anticipate the Spitzer patent. First, as to the patent to Rotheim, No. 1,892,750, issued January 3, 1937, it teaches a method for atomizing liquid materials. Its object is undoubtedly distinct from that of the Spitzer patent. It relates to a spray. The Spitzer patent is for a lather-producing composition. The word "spray" is used some 30-odd times in the Rotheim patent but the word "foam" or "lather" is never used except to caution against producing it. In the Spitzer patent there is no use of the word "spray", but the word "lather" is used some 75 or more times. Furthermore, Rotheim teaches that the ingredients of his soap solution should dissolve in the propellants, whereas it is a basic requirement of the Spitzer patent combination that such ingredient shall *not* dissolve in the propellants. Thus, reliance upon Rotheim would mislead, rather than aid in attaining what the Rotheim patent teaches. This is the position that Colgate itself took in connection with the application of Norman Fine, filed August 8, 1951, for a patent. It, therefore, is clear that Rotheim does not anticipate "Rise".

Second, as to the Getz patent, No. 2,-294,172, issued August 25, 1942, this teaches the making of whipped cream with a propellant, that is, a gas, soluble in water and in the cream that is to be used. The gas preferred by Getz in his specifications is nitrous oxide. It is uncontradicted that if such be used to produce a shaving lather, the result will be completely unsatisfactory. It is true Getz states that Freon-12 is highly water soluble. But we understand this is indisputably an erroneous statement. Thus, it is clear, without further analysis of Getz, that it is not an anticipation of the Spitzer patent. Colgate took the same position with respect to Getz in relation to the Norman Fine patent application of August 8, 1951, to which we have just referred in considering the Rotheim patent. Parenthetically, it is to be noted that the Getz patent has been held valid in the Eighth Circuit in Aeration Processes, Inc., v. Lange, 196 F.2d 981, but invalid in the Second Circuit in Aeration Processes, Inc., v. Walter Kidde & Co., Inc., 170 F.2d 437.

Finally, we come to the patent to Boe, No. 2,524,590, issued October 3, 1950. This again is for an aerosol spray. It does not teach the making of a lather but of a fine mist for the spraying of insecticides, fumigants, perfumes, waxes, paints, lacquers, detergents, lubricants, polishes, dies, rubber solutions, oils and other miscellaneous materials. So Boe requires that the ingredients dissolve in the propellant and he cautions against the production of a form of lather.

Colgate relies very largely on this patent, and in the course of the trial introduced samples of lather produced by Colgate's expert witness, Dr. Smith, claimed to have been produced by following the Boe specifications. However, Dr. Smith admitted that he did not follow precisely the procedures specified by Boe, pointing out that Boe says in his patent specifications that, "The emulsions contemplated by the present invention may be produced in any of the known ways of forming emulsions, no claim being made herein to the method by which the emulsions are formed." But we agree with the position taken by counsel for Carter, that this general statement is not to be construed as permission to omit, as was done in the experiments of Dr. Smith just referred to, the mixing of the liquid propellant *under pressure* with the material to be sprayed, and that the broad statement just quoted with respect to the use "of any of the known ways of forming emulsions" must be construed as

meaning merely that, after the ingredients are put together in the way Boe specifies, they are to be homogenized or ground together. The Boe patent is basically for a spray. The word "spray" is used more than 60 times, whereas the word "foam" or "lather" is never mentioned except to caution against its production. In his application for a patent for the Rapid Shave product, Fine stated that "When the composition contains propellant in amounts up to about 15% the shaving cream is discharged from the container in the form of a rich, stable foam. This desired foam is not produced, however, when much larger amounts, such as the 35% of propellant shown by Boe, are used. Sputtering occurs when these larger amounts of propellant are used and the product is discharged from the container in the form of droplets rather than as a foam." Professor La Mer, the inter partes, neutral expert witness, testified that the Boe propellant proportions are in excess of the outer range specified in every claim of the Spitzer patent.

Colgate urges that one of the attorneys, now deceased, when promoting the Spitzer application in the Patent Office, deliberately misrepresented the Boe patent when he stated that "there is no disclosure in Boe of any composition capable of producing lather", or "of any composition combining an aqueous soap solution with the propellants claimed by the applicants." As to the first of these statements, it is difficult to see how it can be construed as having been made wilfully, as charged, when Boe himself insists in his specifications that he does not want to obtain lather. As respects the second statement also, it was at most an unintentional error, and, in fact, according to the testimony of both Dr. Smith and Professor La Mer, the inter partes neutral expert witness, the small amounts of soap solutions referred to may well have been absorbed in composition with the specified propellants. So, we conclude that this entire contention is tantamount to seizing at a straw, and unworthy of serious consideration. In fact, it is in direct contradiction of the position taken by Colgate in connection with the Norman Fine application of August 8, 1951, heretofore referred to, wherein it is said: "There is no disclosure in Boe of any composition capable of producing a lather."

Thus we must conclude that Boe does not anticipate "Rise", either by itself or coupled with what had previously been disclosed by Rotheim and Getz.

It is significant that Rotheim and Boe were both before the Patent Office on the Spitzer application. Also, while the Getz patent, No. 2,294,712, here relied upon, was not before the Patent Office, a later, companion patent to Getz was before it, namely, Getz No. 2,435,682, issued February 10, 1948. Under the patent law "A patent shall be presumed to be valid. The burden of establishing invalidity of a patent shall rest on a party asserting it." 35 U.S.C.A. § 282. This presumption has not been overcome by reliance upon any of these prior patents. The Patent Office is believed to have been correct in not treating them separately or in combination as anticipating the Spitzer discovery.

### B—Prior Use

In addition to the aforegoing six patents, defendants rely, in anticipation of the Spitzer patent, upon (1) use in this country in 1946 and 1947, of a Daggett & Ramsdell product; and (2) a prior invention of the Gebauer Chemical Company, called Sonni Foam Shampoo, and sales of some 300 bottles of this product in Cleveland in October or November, 1948. Apart from the fact that this latter product was apparently a commercial failure and abandoned after only a few of the 300 bottles were actually sold, it is uncontradicted that the propellant used in it was a mixture of Freon-11 and ethyl chloride, which have neither the solubility nor the vapor pressure limitations of any of the claims of the Spitzer patent that are in suit. Furthermore, Freon-11 is not in any of the Freon groups embraced in these claims. Also, these claims require that the soap compo-

sition shall be nonjelling, which is not true of the Shimrock composition. Thus this latter composition, by the weight of the credible evidence, falls far short of being an anticipation of "Rise".

Turning to the Daggett & Ramsdell product, the material facts summarized are these: in 1946 one William Segelken, a chemist with Daggett & Ramsdell, Inc., then a subsidiary of Standard Oil Company of New Jersey, secretly developed several shaving lather compositions, pressurized with either a mixture of Freon-11 and -12, or of Genetron-101, Freon-11 and Freon-12. Segelken gave samples of this composition to eight persons to try, all of whom were either his relatives or connected with his company. They were to report their evaluation of the product to him, which they did, and he, in turn, reported it to his superiors.

▇▇ Segelken himself did not testify at the trial, being absent in the Armed Forces. All of the above facts have been presented to this Court by deposition only, taken recently,—eight years after the event. All of the alleged experiments have not been put in evidence because one of Segelken's notebooks is missing. Thus it is impossible to say just what composition was used by whom or, more specifically, whether the composition given to any of the eight persons for testing was, in fact, one embracing a Freon or Freons. Therefore, such proof is believed to be too inadequate to support a definite finding of anticipation. Furthermore, Daggett & Ramsdell never filed an application for a patent on what Segelken had produced, or published it or placed it on the market. In other words, it was abandoned. Section 102(g) renders such abandonment a bar. See Nelson v. Lenning, 96 F.2d 508, 25 C.C.P.A., Patents, 1119. What counsel for Carter said appears to be correct, namely, that what Daggett & Ramsdell did remained secret, effectively concealed and suppressed, until exhumed by Colgate for the defense of this case.

Thus, because of the inadequacy of proof respecting the identity of the composition that Segelken produced and, as claimed, gave to a number of people to try and report the results; and also because of his complete abandonment of whatever he may have accomplished, it becomes unnecessary to decide whether such use ever went beyond an incomplete, experimental stage, that is, "was known or used by others in this country * * before the invention" of the Spitzer patent occurred, within the meaning of Section 102(a); or "was * * * in public use or on sale in this country, more than one year prior to the date of the application for" the Spitzer patent, within the meaning of Section 102(b). Knowledge and use in *foreign* countries is not a bar under the Statute. Alexander Milburn Company v. Davis-Bournonville Company, 270 U.S. 390, 46 S.Ct. 324, 70 L. Ed. 651; Ellis-Foster Co. v. Reichhold Chemicals, Inc., 3 Cir., 198 F.2d 42. Furthermore, none of the Segelken formulae can, in fact, properly be interpreted as anticipating any of the eight claims of the Spitzer patent in suit because none of the combinations of these claims is suggested by such evidence of Segelken's work as is before the Court.

▇▇▇ In the opinion of the Supreme Court by Mr. Justice Roberts in the case of United States v. Dubilier Condenser Corp., 289 U.S. 178, 188, 53 S.Ct. 554, 557, 77 L.Ed. 1114, it is said that the act of invention "consists neither in finding out the laws of nature, nor in fruitful research as to the operation of natural laws, but in discovering how those laws may be utilized or applied for some beneficial purpose, by a process, a device, or a machine. It is the result of an inventive act, the birth of an idea and its reduction to practice; the product of original thought; a concept demonstrated to be true by practical application or embodiment in tangible form." In Diamond Rubber Company of New York v. Consolidated Rubber Tire Company, 220 U.S. 428, at page 435, 31 S.Ct. 444, 447, 55 L.Ed. 527, the Supreme Court had previously said: "Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never

having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skilful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration." See also Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672; Hutzler Bros. Co. v. Sales Affiliates, Inc., 4 Cir., 164 F.2d 260. It is true that where an article has been used and the method of its manufacture is known, more than a new advantage of the product must be discovered in order to claim invention. It is not invention to perceive that the product which others had discovered had qualities that they failed to detect. See General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43; DeForest Radio Co. v. General Electric Co., 283 U.S. 664, 51 S.Ct. 563, 75 L.Ed. 1339. The application of a combination of old elements to a new and closely analogous use, if that use to one skilled in the prior art would be indicated as an appropriate use, is not invention. See Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L. Ed. 997. But, as was said in Goodyear Tire & Rubber Co. v. Ray-O-Vac, 321 U.S. 275, at page 279, 64 S.Ct. 593, at page 594, 88 L.Ed. 721: "Viewed after the event, the means * * * adopted seem simple and such as should have been obvious to those who worked in the field, but this is not enough to negative invention."

Section 103 of the Patent Act, 35 U.S. C.A. § 103, provides that a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Does the subject matter of the Spitzer patent meet this requirement of the law? We are satisfied that it does, when interpreted in the light of the controlling principle just given. After lengthy experimentation by Spitzer and his co-inventors, they discovered and perfected, we find, a combination different from any pressurized self-generating lather composition hitherto known to the art; that this was "the result of an inventive art", "the product of original thought", and that therefore it rises to the status of invention. It is significant that Colgate, in the autumn of 1954, so considered and advertised its own product which it admits infringes the Spitzer patent by stating to its British customers that "We believe that Palmolive Rapid Shave is the greatest discovery in shaving history since the invention of the safety razor".

It is not considered necessary to analyze here the various decisions upon which counsel for Colgate rely in opposition to the conclusion which we reach, particularly Corona Cord Tire Company v. Dovan Chemical Corporation, 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610; Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755; Sewall v. Jones, 91 U.S. 171, 23 L.Ed. 275; Minerals Separation North American Corporation v. Magma Copper Company, 280 U.S. 400, 50 S.Ct. 185, 74 L.Ed. 511, and General Electric Co. v. Wabash Appliance Corporation, 2 Cir., 91 F.2d 904, because from an examination of these decisions and others upon which counsel for Colgate rely, it is clear that they relate to factual situations quite different from those in the present case.

Precisely what is this new combination? The individual ingredients of the shaving soap solutions embraced in the Spitzer patent were old in the art. So were the Freons. Also, Freons had previously been used successfully as propellants in aerosols and insecticides. In other words, the *combination* of some Freons with the Spitzer soap solutions was not new in the art. But the combi-

nation of an aqueous soap solution, emulsified in the liquid base with a Freon which had not only low water solubility but which combined the properties of (1) not smarting or burning the face, and (2) good, stable lather, was unknown. There were a number of Freons used in the propellant art which did not smart or burn the face, but they did not afford a good stable lather. Conversely, there were those Freons that were known to give a satisfactory lather but they were disagreeable on the skin. It is this combination of a relatively small group of Freons, that manifest those desirable properties of low water solubility and the optimum characteristics of non-smarting and of lather quality, with aqueous soap solutions that constitutes the invention of Spitzer and his associates. They discovered that all three of these characteristics were inter-related. They found that Freons having a solubility in water not exceeding about 32 cc. of gas to 100 grams of water to be the type of Freons productive of the optimum of the other two qualities desired in the lather composition. This is what the specifications of the Spitzer patent teach, and all 8 of the claims in suit are responsive to this teaching. Claims 6 and 9 are limited to the use of Freon-114. Claims 8 and 10 are limited to the use of Freon-12. Claims 18 and 20, which are based upon claim 16 as a parent claim, prescribe the use of any one of a group of five Freons, including 12 and 114. Claims 5 (based on claim 2) and 15 embrace the use of a broader group of Freons, but in this group also are *only* Freons that are essentially non-smarting to the face, and stable in lather forming. In fact, the entire 21 claims of the patent are so limited.

■ To summarize: we conclude that the Spitzer patent has not been anticipated by (1) any prior patent in this or any foreign country; (2) any prior printed publication in this or any foreign country, and (3) any prior public use or sale in this country. We find that the Spitzer patent is valid as to all claims, and nothing more need be said

with respect to the question of infringement by Colgate of the 8 claims of the patent which are in suit, because Colgate admits infringement of these claims. It also follows that little need be said with respect to whether the other defendants, the Stalfort companies and Read, are also infringers, because it is clear from the evidence that they have infringed,— the Stalfort companies, because they served as agents of Mennen to combine the soap solution and the propellant of the Rise product in containers, then to pack these containers and ship them to Mennen's customers; and Read, because it purchased from Colgate the Rise product, ready for sale, and sold it to the retail trade. What those defendants did is clearly infringement, as defined in the Patent Act, 35 U.S.C.A. § 271(a). We are not, however, prepared to say that they "actively induced" infringement, or knowingly contributed to it, within the meaning of Section 271(a) and (b).

### Alleged Wrongful Appropriation of Confidential Information and Trade Secrets

■ Turning to the second cause of action, namely, that based upon the alleged wrongful appropriation of trade secrets by Colgate, Carter asserts that Colgate wrongfully appropriated trade secrets relating to the composition of "Rise". This Court has jurisdiction of this cause of action by reason of Section 1338(b) of Title 28 U.S.C.A., which vests in the District Courts "original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under * * * patent * * * laws". In the present case the claim of unfair competition is directly joined with the claim of infringement of the Spitzer patent. So, in determining the question whether Colgate has wrongfully appropriated any of Carter's trade secrets relating to the subject matter of the Spitzer patent, this Court is not limited to a consideration of the law of the locus of the alleged wrongful appropriation, or of the law of any other particular jurisdiction. As a mat-

ter of fact, as will be disclosed by the analysis of decisions about to be made, there is virtual uniformity in the decisions as to the principles of law governing this question.

The contentions of Carter may be summarized as follows: that Norman Fine, a former employee of Foster D. Snell, Inc., research chemists employed by Carter, left his employment where he participated in the development of "Rise" and went to work for the defendant Colgate; that he was under contractual obligation to Snell not to disclose trade secrets that he had learned during the course of his employment at Snell's; that, in spite of his obligation to maintain this confidential relationship, Fine revealed to Colgate, less than two months after he began his work with Colgate, the exact formula of the composition of "Rise"; that he combined at Colgate one-half of "Rise" with one-half of the composition that had been formulated by Allen, a co-worker at Colgate; that the resulting product eliminated the problems encountered by Colgate prior to Fine's arrival at Colgate, and that this product was marketed by Colgate as Rapid-Shave No. 1.

Carter further contends that Fine proceeded to alter Rapid-Shave No. 1 so as to make it more nearly duplicate "Rise" by eliminating the sodium and potassium soaps which were in Allen's composition, and by duplicating the 8 percent triethanolamine stearate of "Rise"; that, at the same time, Fine made certain additions to this second product that were calculated to improve the characteristics of the lather; Fine having previously learned from his development work on "Rise" at Snell's that these additions would impart the desired characteristics to the lather; that, in spite of the fact that Fine, under his contract with Snell, had been enjoined to strict secrecy at Snell's, he disclosed these matters to his new employer, Colgate; that Fine compounded for Colgate Rapid-Shave No. 2, a product that was a closer duplicate of "Rise" than Rapid-Shave No. 1, and that, in addition, Fine, through Colgate's

patent counsel, proceeded to file patent applications on these trade secrets, which are still pending.

Carter still further contends that Fine had learned during the course of his development work on "Rise" at Snell's that a light mineral oil could be successfully used with certain soaps without producing an adverse effect upon the quality of the lather, and yet at the same time operate as a sufficient depressant of the propellant to permit the use of Freon 12 alone; that the elimination of Freon 114, which was an expensive item, would thus result in a more economical product, yet possessing the characteristics of the more expensive one; that Fine disclosed this trade secret to Colgate; that Colgate proceeded to utilize this valuable information by developing and putting Instant Barber Shave on the market, in spite of the fact that Fine had told Colgate's patent counsel that he had worked on this precise disclosure at Snell's, while developing "Rise".

Colgate, on the other hand, contends that none of Fine's knowledge acquired at Snell's which he disclosed to Colgate constituted trade secrets because the information was already well known in the trade, and had been available to the public since April, 1950, when "Rise" was put on the market. However, Colgate saw fit to file two patent applications based on this information, prior to Carter's institution of the present suit. Thus, the contention that this information was previously known in the trade is clearly inconsistent with Colgate's filing these two applications, covering the same subject matter.

Carter maintains that since there is an abundance of other evidence in the present case of novelty of the information disclosed to Colgate by Fine which is adequate to support patentability, a fortiori, it is adequate to constitute a trade secret, since novelty required for the latter is less than that required for patentability.

Carter further contends that Fine did not restrict his breach of confidence to

the area of formulating the composition contained in the can; that Colgate, in its efforts to duplicate "Rise", encountered the problem of how to overcome the splitting of the polyethylene dip tube, for which no solution was known to Colgate before Fine came to Colgate, but that Fine again drew upon his store of Carter's trade secrets and presented to Colgate the idea of annealing the dip tube, which was used by Colgate in marketing Rapid-Shave No. 1.

We find to be correct, by the weight of the credible evidence, the following chronology of what occurred from the beginning of the development of "Rise" to the institution of the present suit: March, 1949: Spitzer, Reich and Fine began their research and development work. April, 1950: Carter put "Rise" on the market. May and July, 1950: Colgate analyzed "Rise", and endeavored, unsuccessfully, to duplicate it, although claiming that the "Rise" formula had been completely reproduced but was not found satisfactory, particularly because it did not result in sufficient exhaustion of the product from the can. Also, Colgate was troubled with sputtering of the product. September, 1950: Fine entered the employment of Colgate although he had been a co-inventor of "Rise". October, 1950: Fine revealed to Colgate the causes of the sputtering. November, 1950: Fine disclosed to Colgate the precise formula of "Rise", and also combined that formula with diluted Colgate lather, to make Rapid-Shave No. 1. Further, he disclosed to Colgate, and to the latter's supplier of valves, the syphon tube annealing process employed by Carter for "Rise". August, 1951: Colgate filed in Fine's name a patent application covering the formula of Rapid-Shave No. 1, which embodied his work originally done on "Rise". November, 1951: Fine prepared, and disclosed to Hansen, his assistant at Colgate, a duplicate formula for "Rise", superfatted, i. e., with excess of fatty matter (soap). September, 1952, until February, 1953: Colgate pursued its experimentation in superfatting the "Rise"

formula with petrolatum, carbowax and excess stearic acid, and then marketed its Rapid-Shave No. 2. September, 1953: Colgate filed its second patent application in the name of Fine and associates, based on the development work that Fine had done while employed by Snell. October 13, 1953: the Spitzer ("Rise") patent was issued and the present suit was instituted the same day.

From the aforegoing the Court believes that only one conclusion is justified, namely, that Carter has met the burden of proof which rests upon it that the information disclosed to it by Fine, as hereinbefore set forth in summary, amounted to wrongful appropriation of secret, confidential information, acquired by Fine while at Snell's. True, there is no evidence that Colgate induced Fine to come to them. But it is not necessary to, nor do we find that Colgate's employment of Fine was originally arranged for the specific purpose of having him divulge confidential information about the "Rise" patent that he had acquired at Snell's. The basis of our decision that Colgate's action was wrongful is that Colgate knew, or must have known by the exercise of fair business principles, that the precise character of Fine's work with Snell was, in all likelihood, covered by the agreement which Fine had with Snell not to divulge trade secrets, and that, therefore, Colgate was obligated to do more than it did towards ascertaining the extent to which Fine was, in fact, restricted in what he might disclose to Colgate. That it was wrong for Colgate not to go further than it did in this respect is confirmed by the very status of Fine when he came to Colgate. At that time Fine was a joint inventor and patentee of "Rise". In other words, Fine was willing to be, and was knowingly placed by Colgate in work that was in direct competition with the work in which Fine had shared at Snell's, resulting ultimately in his own patent. The very fact that Fine would do this should, per se, have raised in the minds of the representatives of Colgate, who arranged the employment of Fine, a feeling that

he was entering upon a rather strange employment under the circumstances. It, therefore, was not enough for Colgate to say that they would see that Fine lived up to the limitations imposed by his contract with Snell. The weight of the credible evidence discloses that Colgate was far from being sufficiently avid to ascertain what those limitations really were, and to have Fine live up to them.

In E. I. DuPont De Nemours Powder Co. v. Masland, 244 U.S. 100, at page 102, 37 S.Ct. 575, at page 576, 61 L.Ed. 1016, the Supreme Court said: "The word property as applied to trademarks and trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith. Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations. If there is any disadvantage in the fact that he knew the plaintiffs' secrets, he must take the burden with the good."

In O. A. Smith Corporation v. Petroleum Iron Works Co. of Ohio, 6 Cir., 73 F.2d 531, in an action for patent infringement and also for damages for appropriation of secret processes in connection with welding that was useful in fabrication of stills employed in refining crude oils, the Court said, 73 F.2d 531, at pages 538–539: "The mere fact that the means by which a discovery is made are obvious, that experimentation which leads from known factors to an ascertainable but presently unknown result may be simple, we think cannot destroy the value of the discovery to one who makes it, or advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer. Facts of great value may, like the lost purse upon the highway, lie long unnoticed upon the public commons. Hundreds pass them by, till one more observant than the rest makes discovery. It is idle to say that, in the eyes of the law, interest may not in such case follow discernment. We think the court below was right in rejecting the master's application of the law in respect to those secret processes held by the master to be invalid for the reason that they were in the public domain, or within the reach of the skilled mechanic in the trade.

" * * * The defendant had sought in many ways to obtain the knowledge necessary to enable it to compete successfully with the plaintiff in the making of pressure vessels. It finally engaged Hawthorne, who for many years had been employed in the plaintiff's welding department, and who was under express contract not to divulge any information received by him during his confidential relationship to the plaintiff. The conclusion is inescapable that the defendant knew of Hawthorne's employment in a confidential capacity. Shanor, its superintendent, had been denied access to the plaintiff's welding shop, though shown its other activities. The infringement of the secret processes followed Hawthorne's engagement with the defendant. Hawthorne had represented to the defendant that electric welding was more highly developed, more economically done, and on heavier products by the plaintiff than by others. The defendant largely increased his salary over that paid by its predecessor. Hawthorne's own estimate of the value of plaintiff's secrets and their cost of acquisition are revealed in his address to the National Board of Welding Engineers after he joined the defendant's organization, and the extensive advertising by the defendant of the novelty of its Fluid-Fusion welding process is further corroboration both of the value of the secret processes, their recent

discovery, and the fact that they did not lie exposed in the public domain."

In Schreyer v. Casco Products Corp., 2 Cir., 190 F.2d 921, the appellate court affirmed the lower court's judgment on the cause of action for unfair competition, although it reversed the lower court's finding that the patent involved, which was for an electric steam iron, was invalid. The Court said, 190 F.2d at page 924: "The information confidentially obtained and used during 1948 was substantially disclosed by the issuance of the patent on July 5, 1949, and the use of that source of information would not, apart from the risk of infringement, have been wrongful. Conmar Products Corp. v. Universal Slide Fastener Co., 2 Cir., 172 F.2d 150. Nevertheless, the trial court found that the use of the confidential disclosures enabled the defendant to produce and market its iron at an earlier date than would have been possible had it relied upon independent research into the construction of the plaintiff's iron then on the market or upon the patent. It accordingly ordered an accounting of the profits resulting from the acceleration of the date when production was possible."

■ In Conmar Products Corporation v. Universal Slide Fastener Co., 2 Cir., 172 F.2d 150, cited in the quotation just made from the opinion in the Schreyer decision, it was held by the Second Circuit Court of Appeals that a contract binding an employee to secrecy, imposed secrecy only until the issue of the patent involved. See also Picard v. United Aircraft Corporation, 2 Cir., 128 F.2d 632; Pennington Engineering Co. v. Houde Engineering Corporation, 2 Cir., 136 F.2d 210. However, in the Sixth and Seventh Circuits, it has been held otherwise. See Shellmar Products Co. v. Allen-Qualley Co., 7 Cir., 87 F.2d 104, and A. O. Smith Corporation v. Petroleum Iron Works Co. of Ohio, 74 F.2d 934. We believe that the rule followed in the Second Circuit is the correct one, and this is conceded on behalf of Carter in the present case.

In Vulcan Detinning Company v. American Can Company, 72 N.J.Eq. 387, at pages 398–401, 67 A. 339, at pages 344, 12 L.R.A., N.S., 102, the Court said: "It is all but impossible to demonstrate by direct proof that a corporation has knowledge apart from the knowledge possessed by the agencies through which its functions are performed; hence the mere fact that the complainant is unable to adduce any corporate resolution of the defendant expressly asserting its knowledge of the complainant's secret and of Assmann's connection therewith does not prevent our reaching the conclusion that the defendant had such knowledge, if such is the inference to which the testimony, by irresistible weight of probability tends. * * *

"By force of this rule and of the reasoning upon which it rests, the American Can Company is chargeable with the knowledge possessed by Assmann only in case the principal—that is, the Can company—if acting for itself in the acquisition of the complainant's process, or (being a corporation) if acting through some other agent, would have received notice of the material matters known to Assmann. In applying this rule we think it is reasonably certain that if the board of directors of the American Can Company, when they contemplated going into competition with the complainant in the detinning business by use of its process, has set about the acquisition of a practical knowledge of the construction and working details of such process, either as a board of directors or by the employment of agents not already possessed of such knowledge, they must inevitably have run up against the barrier of secrecy maintained by the complainant for the express purpose of heading off such competition. In that case they would either have failed to obtain the secret of the complainant's process except with its knowledge and consent, or, if they did obtain it clandestinely from someone who held it in confidence, would have done so under circumstances that would have put them upon inquiry, and hence

have charged their corporation with whatever knowledge such inquiry would have led to. This is the test established by the case of Sooy v. State, [41 N.J. Law, 394] (as applied to a corporation) and the conclusion to which it leads is that the defendant corporation holds the fruits of Assmann's agency in its behalf with the burden of so much of the knowledge possessed by him as would have come to it, if it had acted for itself, or through an agent who was not already possessed of such knowledge."

The decisions upon which Colgate relies are not believed to be opposed to the principles laid down in the decisions which we have analyzed and which represent the weight of authority, because it is clear that those other decisions embrace facts quite distinct from the facts in the present case. This is true, for example, of Telechron, Inc., v. Parissi, D.C., 120 F.Supp. 235, and also of Lyon v. Bausch & Lamb Optical Co., D.C., 119 F.Supp. 42. In the first of these cases, the Court, after a lengthy detailed analysis of the facts, held that the evidence was insufficient to sustain the patentee's counterclaim that the corporation by which the patentee had been employed, and its subsidiary corporation, by their manufacture and sale of flashing light alarm clocks, etc., wrongfully appropriated and used certain concrete information and ideas relative to inventions set forth in the patents, and which had been disclosed to the corporations in confidence prior to filing and issuance of the patents; but that on the contrary the evidence strongly indicated independent development. The Court said, 120 F. Supp. 235, at page 240: "Therefore, Parissi does not shoulder in my judgment the serious burden imposed upon him by law, or by even a fair preponderance of the evidence prove the elements necessary to support his counterclaim of unjust enrichment through violation of confidential disclosures. Many of the elements necessary to such recovery under the law are not shown clearly and sufficiently to carry conviction. The essentials of knowledge, confidence, understanding, express or implied, of compensation, novelty, secrecy; the combination of which constitutes the fraud and breach of faith, in my judgment is not sufficiently proven."

The second, the Lyons case, involved a patent on a method for applying hard, durable, low-reflecting films of inorganic salts on the surfaces of optical elements. In addition to patent infringement, plaintiff asserted a secondary cause of action for unjust enrichment by defendant optical company's alleged wrongful use of confidential information, given the company by the plaintiff as to the patented process. But the Court said, 119 F.Supp. 42, at page 52: "Defendant's use of the process in its non-governmental work commenced at about the time that the plaintiff wrote the defendant calling its attention to the fact that he had received a patent. From the time of the issuance of the patent the information regarding the process was public knowledge. Therefore the use by the defendant of the process after the issuance of the patent was not wrongful, apart from the risk of infringement. Schreyer v. Casco Products Corp., 2 Cir., 190 F.2d 921, 924. *It is true that the defendant became skilled in the operation of plaintiff's process prior to the grant of the patent, and that this circumstance gave the defendant the advantage of being able to commence promptly to use the process on its non-governmental work. This advantage, however, so acquired was an unavoidable incident to the lawful use of the process by the defendant in performing its government contracts for the manufacture of the optics for the Navy. Since there was no unlawful use of the process prior to the issuance of the patent, the defendant may not be held to have been unjustly enriched by making use of confidential disclosures regarding the process.*" (Emphasis supplied.)

In Tabor v. Hoffman, 118 N.Y. 30, at pages 34–37, 23 N.E. 12, at pages 12–13, the Court said: "It is conceded by the appellant that, *independent of copyright or letters patent, an inventor or author,*

has, by the common law, an exclusive property in his invention or composition, until by publication it becomes the property of the general public. * * * As the plaintiff had placed the perfected pump upon the market, without obtaining the protection of the patent laws, he thereby published that invention to the world, and no longer had any exclusive property therein. [Rees v. Peltzer, 75 Ill. 475; Clemens v. Belford, Clark & Co., C.C., 14 F. 728; Short's Laws of Literature, 48]. But the completed pump was not his only invention, for he had also discovered means, or machines in the form of patterns, which greatly aided, if they were not indispensable, in the manufacture of the pumps. This discovery he had not intentionally published, but had kept it secret, unless, by disclosing the invention of the pump, he had also disclosed the invention of the patterns by which the pump was made. The precise question, therefore, presented by this appeal, as it appears to us, is whether there is a secret in the patterns that yet remains a secret, although the pump has been given to the world? The pump consists of many different pieces, the most of which are made by running melted brass or iron in a mould. The mould is formed by the use of patterns, which exceed in number the separate parts of the pump, as some of them are divided into several sections. The different pieces out of which the pump is made are not of the same size as the corresponding patterns, owing to the shrinkage of the metal in cooling. In constructing patterns it is necessary to make allowances, not only for the shrinkage, which is greater in brass than in iron, but also for the expansion of the completed casting under different conditions of heat and cold, so that the different parts of the pump will properly fit together and adapt themselves by nicely balanced expansion and contraction to pumping either hot or cold liquids. If the patterns were of the same size as the corresponding portions of the pump, the castings made therefrom would neither fit together,

nor, if fitted, work properly when pumping fluids varying in temperature. The size of the patterns cannot be discovered by merely using the different sections of the pump, but various changes must be made, and those changes can only be ascertained by a series of experiments, involving the expenditure of both time and money. Are not the size and shape of the patterns, therefore, a secret which the plaintiff has not published and in which he still has an exclusive property? Can it be truthfully said that this secret can be learned from the pump, when experiments must be added to what can be learned from the pump before a pattern of the proper size can be made? As more could be learned by measuring the patterns than could be learned by measuring the component parts of the pump, was there not a secret that belonged to the discoverer, until he abandoned it by publication, or it was fairly discovered by another? If a valuable medicine, not protected by patent, is put upon the market, any one may, if he can by chemical analysis and a series of experiments, or by any other use of the medicine itself, aided by his own resources only, discover the ingredients and their proportions. If he thus finds out the secret of the proprietor, he may use it to any extent that he desires without danger of interference by the courts. But, because this discovery may be possible by fair means, it would not justify a discovery by unfair means, such as the bribery of a clerk who, in course of his employment had aided in compounding the medicine, and had thus become familiar with the formula. * * *

"The fact that one secret can be discovered more easily than another, does not affect the principle. Even if resort to the patterns of the plaintiff was more of a convenience than a necessity, still, if there was a secret, it belonged to him, and the defendant had no right to obtain it by unfair means, or to use it after it was thus obtained. We think that the patterns were a secret device that was not disclosed by the publication of the pump, and that the plaintiff was entitled

to the preventive remedies of the court. While the defendant could lawfully copy the pump, because it had been published to the world, he could not lawfully copy the patterns, because they had not been published, but were still, in every sense, the property of the plaintiff, who owned not only the material substance, but also the discovery which they embodied."

In Fairchild Engine & Aeroplane Corporation v. Cox, Sup., 50 N.Y.S.2d 643, the Court granted an injunction against disclosure by the defendant of a process for the bonding of aluminum to steel, known as the Al-Fin process applied to aircraft engine cylinders, which the defendant had learned confidentially while serving in a fiduciary capacity as vice president and director of the Fairchild Corporation and an affiliate company. Thereafter the defendant became associated with General Bronze Corporation in such manner that the confidential knowledge of this process was to be utilized for the benefit of this latter company, in return for which the defendant was to receive royalties and other substantial compensation.

In the course of its opinion, in which the Court relied upon a number of the cases which have just been analyzed, the Court said, 50 N.Y.S.2d at pages 656–657: "Of course if what the defendant threatens to reveal to General Bronze is generally known, he cannot be stopped. But to get on the track of patentability is to get on the wrong track. What these plaintiffs seek is protection of a trade secret. A trade secret need not be patentable. Unless this cardinal distinction is kept clearly in mind, the transcendent issue which this case presents is likely to become blurred beyond recognition. The doctrine of 'prior art', which the defendant invokes as a shield, is of vital importance in patent cases, but it is not so significant in this case. * * *

"The defendant's reply that what he proposed to do does not concern a 'secret,' is contradicted by his own conduct and words. From the mass of testimony the transcendent fact emerges that the plaintiffs' process succeeded where others failed. No one else achieved the practical results these plaintiffs achieved. To retort that others might or could have done it, or were on the same track, does not alter or weaken the fact that the plaintiffs did do it. The plaintiffs' process 'clicked.' And if outsiders knew the 'trick,' why didn't General Bronze engage them? Why not Gay—a licensed engineer, and who affirms that with appropriate backing and facilities he could have accomplished the same result? Gay could have been engaged for substantially less money than Cox—a non-engineer—was to receive. And what of the other experts who testified for the defense regarding their familiarity with the subject? The suspicion is more than faint that Cox knew the trick, and it was the trick that General Bronze desired."

In the American Law Institute Restatement of the Law of Agency, Section 396, the law with respect to using confidential information after termination of an agency is thus stated: "Unless otherwise agreed, after the termination of the agency, the agent: (a) has no duty not to compete with the principal; and (b) is subject to a duty to the principal not to use or disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty. The agent may use general information concerning the method of business of the principal and the names of the customers retained in his memory, if not acquired in violation of his duty as agent." Also, in the Restatement of the Law of Torts, the general principles governing liability for disclosure or use of another's trade secret are thus set forth, Section 757: "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if (a) he discovered the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other

in disclosing the secret to him, or (c) he learned the secret from a third person with notice of the fact that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or (d) he learned the secret with notice of the fact that it was a secret and that its disclosure was made to him by mistake."

Even if the Rise formula itself be treated as public knowledge, still Fine disclosed to Colgate a whole series of experiments that he had conducted at Snell's which taught Colgate the "know-how" necessary to produce Rapid-Shave No. 1, i. e., the use of the triethanolamine soap of Rise in combination with potassium and sodium soaps. Similarly, a comparison of what is disclosed by the laboratory notebooks covering what Fine did at Snell's, with the notebooks covering what he did at Colgate's which led to the production of Rapid-Shave No. 2 and Barber Shave, shows that the work was identical. It is to be noted also that Fine appears as a co-inventor in the Colgate application for a patent for Rapid-Shave No. 2. Counsel for Colgate admitted that Rise was first actually reproduced for Colgate by Fine in November, 1950, that is, after he had been at Colgate's for a number of weeks. However, even assuming—although it is believed contrary to fact,—that the exact formula of Rise had been known to Colgate before Fine came there, Fine, nevertheless, committed a breach of the confidential information that he had obtained at Snell's by disclosing to Colgate the formula for using the triethanolamine soap of Rise in combination with the potassium and sodium soaps that led to Rapid-Shave No. 1. Thus from any angle that Fine's conduct may be approached, it is clear that it was wrongful prior to the issuance of the Spitzer patent, because prior to such issuance, Fine disclosed to Colgate what he had learned at Snell's, and thereby Colgate obtained an advantage that it otherwise would not have obtained at such time. See Chesa-peake & Ohio Ry. Co. v. Kaltenbach, 4 Cir., 124 F.2d 375.

Further analysis of decisions is believed to be unnecessary to show that the law is generally well established that a third party that uses trade secrets of another,—as Colgate has done,—which have been obtained through breach of a confidential relationship, either with actual knowledge of such breach, or of facts from which knowledge of it is reasonably to be inferred, is liable equally with the one who makes the breach,—as Fine has done.

### Laches

■ No question arises here under the Maryland three-year statute of limitations. The present suit was brought in October, 1953, and the first Colgate product was originally put on the market in a sales test in January, 1952, and in the fall of the same year, it was put on sale generally. See Mas v. Coca Cola Co., 4 Cir., 198 F.2d 380. However, Colgate asserts the defense of laches on the ground that Carter knew about Colgate's marketing of its products as early as January, 1952, and that the very substantial expenditures which Colgate made in this connection might have been avoided had Carter indicated promptly that it was going to assert its present claim of unfair competition. But this contention is lacking in merit. It was Carter, not Colgate, that had been misled, to its detriment. In June, 1951, Snell sent the Patent Department of Colgate a copy of Fine's employment contract during the period that he had worked with Snell. The terms of this contract were the subject of correspondence, and Colgate's patent attorney gave Snell assurances that Fine, during his work for Colgate, would respect all the requirements arising from his earlier relations with Snell on behalf of Carter.

■ Thus, there remains the additional question to be determined, namely, the measure of damages applicable against Colgate. This is prescribed in Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, and Reynolds v. Whitin

Machine Works, 4 Cir., 167 F.2d 78, both being decisions of the Court of Appeals for this, the Fourth Circuit. These two decisions have not heretofore been analysed in this opinion because the facts upon which they are based are believed not to have been as similar to the facts in issue as were the facts in the cases which have been analysed herein, although the Hoeltke and Reynolds decisions fully support the legal principle upon which we rest our conclusion that Colgate is liable to Carter for wrongful appropriation of the latter's trade secrets with respect to the invention of the Spitzer patent. The measure of damages prescribed in both of those cases and applicable to the present case is thus stated: "The general rule, of course, is that the monopoly of a patent which entitles a patentee to damages for infringement commences only when the patent is granted; but where, in advance of the granting of a patent, an invention is disclosed to one who, in breach of the confidence thus reposed, manufactures and sells articles embodying the invention, such person should be held liable for the profits and damages resulting therefrom, not under the patent statutes, but upon the principle that equity will not permit one to unjustly enrich himself at the expense of another. * * * It would be a reproach to any system of jurisprudence to permit one who has received a disclosure in confidence to thus appropriate the idea of another without liability for the wrong." 80 F.2d 912, at pages 922–923, and 167 F.2d 78, at page 86.

### Summary of Conclusions

The conclusions of the Court, summarized, are as follows: (1) All of the 21 claims of the Spitzer patent are valid; (2) defendants Colgate, Stalfort and Read have infringed claims 5, 6, 8, 9, 10, 15, 18 and 20; and (3) defendant Colgate has wrongfully appropriated confidential information and trade secrets of Carter.

A decree will be signed, embracing the aforegoing and: (1) permanently enjoining defendants Colgate, Stalfort and Read from committing further acts of infringement of the Spitzer patent; (2) requiring these defendants to account to Carter, and to the other plaintiffs as their interests may appear, for damages and profits occasioned by the infringements; (3) requiring defendant Colgate to account to Carter, and to the other plaintiffs as their interests may appear, for such damages as the plaintiffs have sustained through Colgate's wrongful appropriation of the plaintiffs' confidential information and trade secrets, and for profits derived by Colgate by reason of the same; (4) referring this proceeding to a Special Master for the purpose of determining the amount of damages and profits occasioned by the infringements of defendants Colgate, Stalfort and Read and by the wrongful appropriation of confidential information and trade secrets by defendant Colgate; and (5) requiring the defendants to pay the costs of this proceeding in the proportions to be hereinafter fixed by this Court.